## REPUBLIC STEEL CORPORATION *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 14. Argued October 17, 1940.—Decided November 12, 1940.

**8**

*Messrs. Luther Day* and *Thomas F. Patton,* with whom
*Messrs. Joseph W. Henderson* and *Mortimor S. Gordon*
were on the brief, for petitioner.

*Mr. Thomas E. Harris,* with whom *Solicitor General
Biddle, Assistant Solicitor General Fahy,* and *Messrs.
Robert B. Watts, Laurence A. Knapp, Mortimer B. Wolf,*
and *Morris P. Glushien* were on the brief, for respondents.

Mr. Chief Justice Hughes delivered the opinion of
the Court.

The National Labor Relations Board, finding that the
Republic Steel Corporation had engaged in unfair labor
practices in violation of § 8(1), 8(2) and 8(3) of the
National Labor Relations Act, ordered the company to
desist from these practices, to withdraw recognition from
a labor organization found to be dominated by the com-
pany, and to reinstate certain employees, with back pay,
found to have been discriminatorily discharged or denied
reinstatement. The Board, in providing for back pay,
directed the company to deduct from the payments to
the reinstated employees the amounts they had received
for work performed upon "work relief projects" and to
pay over such amounts to the appropriate governmental
agencies. Except for a modification, not now important,
the Circuit Court of Appeals directed enforcement of the
Board's order. 107 F. 2d 472.

In view of conflict with decisions in National Labor Relations Board v. Leviton Manufacturing Co., 111 F. 2d 619 (C. C. A. 2d) and National Labor Relations Board v. Tovrea Packing Co., 111 F. 2d 626 (C. C. A. 9th), we granted certiorari limited to the question whether the Board had authority to require the company to make the described payments to the agencies of the Government. 310 U. S. 655.

The amounts earned by the employees before reinstatement were directed to be deducted from their back pay manifestly because, having already been received, these amounts were not needed to make the employees whole. That principle would apply whether the employees had earned the amounts in public or private employment. Further, there is no question that the amounts paid by the governmental agencies were for services actually performed. Presumably these agencies, and through them the public, received the benefit of services reasonably worth the amounts paid. There is no finding to the contrary.

The Board urges that the work relief program was designed to meet the exigency of large-scale unemployment produced by the depression; that projects had been selected, not with a single eye to costs or usefulness, but with a view to providing the greatest amount of employment in order to serve the needs of unemployed workers in various communities; in short, that the Work Projects Administration has been conducted as a means of dealing with the relief problem. Hence it is contended that the Board could properly conclude that the unfair labor practices of the company had occasioned losses to the Government financing the work relief projects.

The payments to the Federal, State, County, or other governments concerned are thus conceived as being required for the purpose of redressing, not an injury to

the employees, but an injury to the public,—an injury thought to be not the less sustained although here the respective governments have received the benefit of the services performed. So conceived, these required payments are in the nature of penalties imposed by law upon the employer,—the Board acting as the legislative agency in providing that sort of sanction by reason of public interest. We need not pause to pursue the application of this theory of the Board's power to a variety of circumstances where community interests might be asserted. The question is,—Has Congress conferred the power upon the Board to impose such requirements.

We think that the theory advanced by the Board proceeds upon a misconception of the National Labor Relations Act. The Act is essentially remedial. It does not carry a penal program declaring the described unfair labor practices to be crimes. The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees. Had Congress been intent upon such a program, we cannot doubt that Congress would have expressed its intent and would itself have defined its retributive scheme.

The remedial purposes of the Act are quite clear. It is aimed, as the Act says (§ 1) at encouraging the practice and procedure of collective bargaining and at protecting the exercise by workers of full freedom of association, of self organization and of negotiating the terms and conditions of their employment or other mutual aid or protection through their freely chosen representatives. This right of the employees is safeguarded through the authority conferred upon the Board to require the employer to desist from the unfair labor practices described and to leave the employees free to organize and choose their representatives. They are thus protected from coercion and interference in the formation

of labor organizations and from discriminatory discharge. Whether the Act has been violated by the employer— whether there has been an unfair labor practice—is a matter for the Board to determine upon evidence. When it does so determine the Board can require the employer to disestablish organizations created in violation of the Act; it can direct the employer to bargain with those who appear to be the chosen representatives of the employees and it can require that such employees as have been discharged in violation of the Act be reinstated with back pay. All these measures relate to the protection of the employees and the redress of their grievances, not to the redress of any supposed public injury after the employees have been made secure in their right of collective bargaining and have been made whole.

As the sole basis for the claim of authority to go further and to demand payments to governments, the Board relies on the language of § 10 (c) which provides that if upon evidence the Board finds that the person against whom the complaint is lodged has engaged in an unfair labor practice, the Board shall issue an order—"requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act."

This language should be construed in harmony with the spirit and remedial purposes of the Act. We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. We have said that "this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair

**12**

labor practices even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." We have said that the power to command affirmative action is remedial, not punitive. *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197, 235, 236. See, also, *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 267, 268. We adhere to that construction.

In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.

We think that affirmative action to "effectuate the policies of this Act" is action to achieve the remedial objectives which the Act sets forth. Thus the employer may be required not only to end his unfair labor practices; he may also be directed affirmatively to recognize an organization which is found to be the duly chosen bargaining-representative of his employees; he may be ordered to cease particular methods of interference, intimidation or coercion, to stop recognizing and to disestablish a particular labor organization which he dominates or supports, to restore and make whole employees who have been discharged in violation of the Act, to give appropriate notice of his compliance with the Board's order, and otherwise to take such action as will assure to his employees the rights which the statute undertakes to safeguard. These are all remedial measures. To go further and to require the employer to pay to governments what they have paid to employees for services rendered to them is an exaction neither to make the employees whole nor to assure that they can bargain collectively with the employer through representatives of

their own choice. We find no warrant in the policies of the Act for such an exaction.

In truth, the reasons assigned by the Board for the requirement in question—reasons which relate to the nature and purpose of work relief projects and to the practice and aims of the Work Projects Administration—indicate that its order is not directed to the appropriate effectuating of the policies of the National Labor Relations Act, but to the effectuating of a distinct and broader policy with respect to unemployment. The Board has made its requirement in an apparent effort to provide adjustments between private employment and public work relief, and to carry out supposed policies in relation to the latter. That is not the function of the Board. It has not been assigned a rôle in relation to losses conceived to have been sustained by communities or governments in connection with work relief projects. The function of the Board in this case was to assure to petitioner's employees the right of collective bargaining through their representatives without interference by petitioner and to make good to the employees what they had lost through the discriminatory discharge.

We hold that the additional provision requiring the payments to governmental agencies was beyond the Board's authority, and to that extent the decree below enforcing the Board's order is modified and the cause is remanded with direction to enter a decree enforcing the Board's order with that provision eliminated.

*It is so ordered.*

MR. JUSTICE ROBERTS took no part in the consideration and decision of this case.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS:

It might fairly be implied by the words "reinstatement of employees with or without back pay" that the

14

employees must themselves be the recipients of the back pay. Were the opinion based on that ground we would acquiesce. But the judgment here does not rest upon such an interpretation. The holding appears to be on the broad ground that the Board may not require full back pay, even to a wrongfully discharged employee, if he has received pay for services performed on a governmental relief project provided exclusively for the needy unemployed. With this conclusion we cannot agree.

The statute commands that the Board must order "back pay" if the policy of the Act will thereby be effectuated. At least two persons are immediately involved in "back pay," as here used; one who pays and one who receives. The propriety of a "back pay" order as an instrumentality for effectuating the Act's policies, must therefore be determined by the manner in which it influences the payor and payee, one, or both. The central policy of the Act is protection to employees from employer interference, intimidation and coercion in relation to unionization and collective bargaining. We cannot doubt but that a back pay order as applied to the employer will effectually aid in safeguarding these rights. We believe, as did the Board and the court below, that it may well be said that the policies of the Act will be effectuated by denying to an offending employer the opportunity of shifting to government relief agencies the burden of supporting his wrongfully discharged employees. The knowledge that he may be called upon to pay out the wages his employees would have earned but for their wrongful discharge, regardless of any assistance government may have rendered them during their unemployment, might well be a factor in inducing an employer to comply with the Act.

And the construction of the provision for back pay is not helped by labeling the Act's purpose or the Board's action as either "punitive" or "remedial." The "back

pay" provision is clear and unambiguous. Hence, it is enough here for us to determine what Congress meant from what it said.

Nor is there substance to the expressed fear that complete acceptance of the words as Congress wrote them would vest unlimited discretion in the Board, because it would not. That discretion is narrowly limited, by the fact that as to "back pay" the Board can in no instance award any greater sum than "back pay" for the period in which the employee was absent from his employer's services by reason of his employer's violation of the law.