## CORNING GLASS WORKS v. NATIONAL LABOR RELATIONS BOARD et al.

### No. 60.

Circuit Court of Appeals, Second Circuit.

April 4, 1941.

Sayles, Flannery, Collin & Evans, of Elmira, N. Y., and Arthur B. Van Buskirk, John C. Bane, Jr., Seward H. French, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa. (Joseph M. Hartfield, of New York City, of counsel), for Corning Glass Works.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Gerhard P. VanArkel, Bertram Edises, and William F. Guffey, Jr., all of Washington, D. C., for Respondent, National Labor Relations Board.

Wolf, McDonald, Graham & Ingram, of Pittsburgh, Pa. (Robbin B. Wolf, of Pittsburgh, Pa., of counsel), for respondents, Associated Shopmen, Shipping and Trucking Union and others.

Roy I. Carson, of Charleroi, Pa., for respondent, Independent Skilled Glass Workers Union.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a petition by an employer of labor, Corning Glass Works, to review and set aside an order of the National Labor Relations Board directing the petitioner (hereinafter called Corning) to cease and desist from certain unfair labor practices and to cease giving effect to any contracts between itself and any of its nine departmental labor organizations that are respondents in this proceeding; also directing Corning (a) to withdraw all recognition from and to completely disestablish each of the organizations as the representative of its employees for the purpose of collective bargaining, (b) to reimburse its employees for all union dues and assessments which it had deducted from their wages, (c) to reinstate fourteen discharged employees of the Shipping and Trucking Department, and (d) to make whole the employees named in (c) by payment to them of sums equal to what they normally would have earned as wages less their net earnings, but to pay over any sums deducted for receipts of money for work performed upon federal, state, county, municipal or other work relief projects to the appropriate fiscal agencies which supplied the funds, and (e) to post certain designated notices.

We think the findings of the Board, supported by substantial evidence, are sufficient to justify the order except as to item (b), which should be eliminated and not enforced, (d), which should be modified by eliminating the provision for payment to fiscal agencies of moneys derived by the men for work on relief projects, and (e), which should be modified. Accordingly the order should be affirmed and enforced as modified herein.

Corning was engaged in the manufacture and sale of glass products and operated manufacturing plants at various places in the United States including one at Charleroi, Pennsylvania, where the unfair labor practices found to exist occurred. Prior to December 24, 1936, the Charleroi plant was owned and operated by the Macbeth-Evans Glass Company. It was then acquired by Corning and, upon the acquisition, George D. Macbeth, the former president of Macbeth-Evans, who had become vice-president of Corning, duly ratified on behalf of the latter all existing contracts between Macbeth-Evans and the nine departmental labor unions.

The Board found that Corning had dominated and interfered with the administration of the nine labor organizations, had discharged fourteen employees in the Shipping and Trucking Department because of their non-membership in one of the labor organizations determined by the Board to have been company-dominated; through its officers and agents had made intimidating speeches, threats of closing the plant on account of union activity, and had made threats of legal action against individual employees on account of such activity. It found that by means of the above acts Corning had engaged in unfair labor practices contrary to Section 8(1), (2) and (3) of the Act, 29 U.S.C.A. § 158 (1–3).

The first question is whether Corning interfered with attempts of the employees in its plant at Charleroi to have a plant-wide union in place of the craft unions which were set up. The Board has answered this question in the affirmative and we cannot say that its findings were not based on substantial evidence.

In July, 1936, before the plant was sold to Corning, there was a meeting at Russian Hall in Charleroi of about four hundred employees of various crafts. They had become dissatisfied with conditions and voted to join the Shippers and Truckers Union (one of the craft unions). About three hundred of them signed slips authorizing check-offs by that union for their wages. Mrs. Chacko testified that "they were going to try to form one organization within the plant, and * * * although the name at that time was the Shippers & Truckers, we later would change the name, the by-laws and constitution and anything connected with it, and have new officers elected for the organization". She added that one of the employees shortly afterwards told her that one of the Macbeth-Evans officers had said to him not to do anything further toward organizing a union of plant-wide scope and that the manager of her department, Ingland, had asked her to report at the Macbeth-Evans office and told her and other employees that he didn't like their trying to organize into one large union and said that he had warned her before. He also asked her to sign a slip saying that she would not

join the Shippers and Truckers Union. The superintendent Blau then came in. He said that she did not have to sign the slip and suggested a single union for the finishing department. He also told the Shippers and Truckers that the finishing department should not join them unless they secured a modification of their contract with Macbeth-Evans. That company then posted a sign saying that it favored "direct meetings * * * between the elected representatives of each Department and the Management and that each Department or group of workers who are employed in the same work or similar work should elect their own committees * * * ". A union of the employees of the finishing department was then formed and Chacko was made president. Macbeth-Evans required certain changes in the by-laws which were submitted to it, one of which was that only members of the finishing department could belong to the union instead of, as at first proposed, any employee of the Macbeth-Evans plant. The new craft union was named Macbeth Co-Workers Union.

Blau likewise told the Decorating Process Workers who were getting turbulent that he understood that they were organizing and making trouble, that they were all a big happy family and that he did not want any trouble. They then proceeded to form a craft union under the name of the Decorating Process Workers Union.

Martorella, an employee, when asked if the movement at Russian Hall for a union of the whole plant was successful said: "Well, they got so far until a few days after there was a notice put up throughout the departments in the Corning Works, saying that the company did not favor a solid union, but it favored a separate union."

Macbeth-Evans interfered with the movement in 1936 to form a plant union (1) by telling the Shippers and Truckers that they were limited by their contract, (2) by persuading the Finishing Department to form a craft union, (3) by persuading the Decorating Department to form a craft union, (4) by posting a notice expressing disapproval of a plant union.

In October, 1936, a meeting of Macbeth Co-Workers (the Finishing Department) was held, at which it was voted to hear representatives from the American Federation of Labor known as the "Flints". The meeting was attended by about three hundred employees of the department, and Chacko, the president, testified that an overwhelming majority voted to join the Flints. Thereafter the day shift of the employees was summoned to a meeting and told by Mr. Macbeth that he would not have them joining an outside organization. The night shift was told by Blau that he saw no reason for their joining the Flints and if the matter could not be settled "there would be about one thing for Macbeth to do, to shut down and pull out and leave us where we were." Blau also asked the husband of Chacko and the sister of another female worker named Podany to influence those employees not to deal with an outside union. At a meeting of the Grievance Committee of Chacko's union attended by her in December, 1936, Blau chided her for dealing with an outside union and said: "You had better get on the right side of the river before it is too late." He also said that she would not be president of her union long "unless you change your ideas."

In March, 1937, after all the employees in the plant except those represented by the Independent Machine Workers Union had received a raise of wages, the members of that union held a meeting and voted to ask for a raise. Two employees Molineri and Korni thereupon waited on Corning officials. The officials told them that their group was among the highest paid in the plant and the company couldn't afford to increase their wages. A notice was posted for a meeting of the Independent Machine Workers the following Sunday at which they voted to hold a sit-down strike Monday. The various groups working in the plant, except the Independent Skilled Glass and the Furnace and Tankmen, went on strike on Monday and held a meeting of their officers at which a plant-wide organization under one head was decided upon and a committee was appointed to meet Blau. At first Blau would not see the committee. When he did see them he threatened to move the plant elsewhere, suggesting Port Alleghany as a new location, a mountain town where there would be no labor trouble. Arbitration of any disputes was then suggested but Blau said the company would not arbitrate until the strikers went back to work, while the committee reported that the employees would not return to work unless the disputes were arbitrated first. The strike lasted three days. After the employees had gone back to work a contract for one year, with in-

creased wages, was offered by the company and finally closed in April, 1937, under the circumstances later described.

When arbitration of disputes was being discussed, McKibben, the superintendent of the Corning plant, said that there were two people present—Chacko and Cappelli—whose word he would not believe, that before any arbitration was had with them they would have to hold a special meeting and have a record notarized showing that they were chosen for arbitration. Chacko then called a meeting and put a $3 fine on every member who would not attend. Podany refused to come and told Chacko that Blau had said that Podany and Chacko and the rest of the women who were "monkeying" with an outside organization were going to be out of a job if they were not careful. He accused Chacko, Podany and Kopnicky of being agitators and remarked that those married women would be fired if they did not quit outside unions. Later a letter was presented which Blau wanted Podany, Chacko and O'Neill to sign stating that he had not intimidated Podany. There was testimony by Podany that if the letter was not signed Blau threatened to sue her for $10,000, and that Blau made her say that what she had told the meeting the night before about his utterances was not true. Blau denied the story of Podany, but we cannot say that it had no substantial basis. Chacko testified that her organization, the Macbeth Co-Workers Glass Union, would not arbitrate with the company because Blau had intimidated Podany. On March 20, 1937, Chacko telegraphed the Labor Board to send a man to settle the question of organizing and claimed her girls were being threatened.

On the 21st of March, 1937, Mary O'Neill, an employee in the Finishing Department, joined the C.I.O. Shortly after that Corwin, the manager of that department, and Ohliger, the paymaster, came to talk with her and told her that if an outside organization was introduced into the company's plant "they will probably shut this place down". Roger Gillot, of the Shipping and Trucking Department, told Ohliger that he and about fifteen or twenty others were passing around C.I.O. cards. Ohliger said to him to tell the fellows to quit passing the cards around. He added that the company was thinking of extending the plant but said if the employees didn't stop he didn't believe the company was going to build—"in fact they are thinking about moving the plant."

On March 29, 1937, the C.I.O. Federation of Flat Glass Workers granted a charter to Chacko's department. On April 1, 1937, McKibben, the superintendent of Corning, posted the following notice:

"Notice
"Corning Glass Works
"Macbeth-Evans Division
"Charleroi, Pennsylvania
"April 1, 1937.

"No worker in this plant must sign any card or paper to keep his or her job or join any organization to do so.

"Any employee that is found taking time to sign cards or papers or to try to get cards or papers signed will be fired at once.

"The signing of any card under force or unfair influence is not lawful and need not be honored and will not be honored by this company

"A. H. McKibben
"Superintendent."

On April 12, 1937, Chacko was appointed by Corning a member of the Labor Relations Department and her salary advanced, but she was told: "If you make one crooked move or one slip you are to be fired."

After the strike of 1937 Macbeth addressed the officers of the departmental unions. He told them that he wanted them to have individual groups as before, but suggested as a sort of half-way step between a single plant union and the existing nine craft unions the creation of a general committee having representatives from the various groups of employees. He said it would be explained to them by Mr. Sharp, the president of one of the craft unions. Sharp described it and said that it had been in use at the company's plant at Corning, New York, and worked well. When asked why the employees could not have a single union, Macbeth replied that the different departments would not understand each other's work. He said "he wanted to deal with his own people in the plant * * * and would have nothing to do with outside representatives", and added that since the merger of Macbeth-Evans with Corning there was one plant too many, and if the employees "didn't settle down" the company would get rid of Charleroi. Hower, of the company's Labor Relations Department, and certain

other management representatives addressed different groups of workers about joining the C.I.O. Hower told Chacko's girls that when they paid union dues into any outside organization they paid "a bunch of lazy fellows to lay around in hotels and ride about in the best of trains and automobiles, while you slave and work to make that money."

In the end the workers were appeased by the raise of wages and the suggestion and partial adoption of the Corning plan, so that all attempts to substitute a plant union for the craft unions ceased.

The C.I.O. lodged a complaint with the Board based on interference by the company with the rights of its employees to organize and on the unlawful discharges of fourteen employees, whereupon the Board filed its complaint, received proofs and made the order against Corning that we have heretofore described.

We cannot say that the Corning craft unions did not at times act independently and for the benefit of the workers. They even went so far as to hold a sit-down strike. Indeed, it may be inferred that the raise in wages was largely due to their activity. Nevertheless the setting up of a plant union had been frequently agitated by the workers and was actually commenced on several occasions during 1936 and 1937. Such a plant union was consistently interfered with and thwarted by Macbeth-Evans and later by Corning after the latter had acquired the Charleroi business. The fact that the employees achieved a measure of success with the kind of organization permitted them by their employer does not forfeit their right to organize differently if they wish and does not legalize the obstruction by the company of such a change.

It is probably true that the interference or domination of the several unions or groups of employees was largely limited to interfering with the action of the employees as a unit and to interfering with the formation by them of a single union for the purpose of dealing with their employer. But there was credible and substantial evidence that the interference broke up affiliation with A.F.L. in 1936 and with C.I.O. in 1937, and prevented the formation of a single union of the employees themselves during the latter year. Some of the criticisms of Corning's action seem rather trifling, but its fixed determination not to deal with outside unions, effectuated as it was by threats of closing the plant, requires us to enforce the disestablishment of the craft unions as ordered by the Board in the exercise of the discretion committed to it under the Act. Cf. Western Union Telegraph Co. v. National Labor Relations Board, 2 Cir., 113 F.2d 992.

■ Fourteen employees of the Shipping and Trucking Department were discharged by the company in August, 1937, because under the contract between it and the Shipping and Trucking Union it was obliged to retain members of that union in preference to new members whenever lay-offs occurred. These men were properly ordered reinstated. Back pay was also proper under the provisions of Subdivision (d) of the order other than those relating to reimbursement of Public Relief Agencies.

Under Section 8(3) of the Act an agreement to prefer union members is only valid where a union is not "maintained or assisted by any action defined * * * as an unfair labor practice". As the Board held upon substantial evidence, the company interfered with the rights of its employees to self-organization, to form and join labor organizations and to bargain collectively through representatives of their own choosing, which are granted to them under Section 7 of the Act, 29 U.S.C.A. § 157, and dominated or interfered with the formation or administration of a plant union contrary to Section 8(1), (2). Interference with and domination of the rights of the employees were unfair labor practices which necessarily had the effect of maintaining and assisting the craft unions. Consequently the agreement with the Shipping and Trucking Union to retain its members in employment whenever a layoff occurred in preference to other workers who were not members afforded no defense to the discharge of the fourteen nonmembers. Accordingly the finding that the company was guilty of unfair labor practices in interfering with the formation of a plant union justified the order of reinstatement.

■ It is not to be assumed that the order requires back pay to men who would have been discharged under any seniority system which may have been in use when the lay-off occurred. The order has no such meaning. It only requires that the men discharged be made good for losses caused by discrimination. So far as they would have been laid off anyway there would seem to be no loss caused by dis-

crimination. The amount of the losses, if any, and the question whether any of the men refused to accept reemployment as claimed in the company's brief must be determined on facts later developed. Such facts, if established, may afford a defense to a proceeding to punish the company for failing to reinstate and make good any of the fourteen men who may have suffered loss from an unlawful discharge.

 Subdivision 2(b) of the order requiring reimbursement of union dues deducted from wages of employees and provisions of 2(d) for reimbursement of Public Relief Agencies for wages which they may have paid to the fourteen men should be eliminated under the decisions in Western Union Telegraph Co. v. National Labor Relations Board, 2 Cir., 113 F.2d 992, and Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——.

Subdivision 2(e) of the order should be modified so as to require the posting of such a notice as will conform to our decision in Phelps Dodge Corporation v. National Labor Relations Board, 2 Cir., 113 F.2d 202.

The order of the Board should be enforced as modified in respect to Subdivisions 2(b), 2(d) and 2(e).

The motion of the Board is granted to the extent indicated in this opinion.