### VIRGINIA ELECTRIC & POWER CO. v. NATIONAL LABOR RELATIONS BOARD.

### INDEPENDENT ORGANIZATION OF EMPLOYEES OF VIRGINIA ELECTRIC & POWER CO. v. SAME.

### Nos. 5013, 5020.

Circuit Court of Appeals, Fourth Circuit.

Dec. 9, 1942.

---

George D. Gibson and T. Justin Moore, both of Richmond, Va. (Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., on the brief), for petitioner in No. 5013.

Wm. Earle White, of Petersburg, Va. (Paul E. Hadlick, of Washington, D. C., on the brief), for petitioner in No. 5020.

Robert B. Watts, Gen. Counsel, National Labor Relations Board of Washington, D. C. (Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Ruth Weyand and Owsley Vose, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

392

PARKER, Circuit Judge.

These are petitions by the Virginia Electric and Power Company, hereafter called the company, and the Independent Organization of Employees of the Virginia Electric and Power Company, hereafter called the I. O. E., to set aside an order of the National Labor Relations Board ordering the disestablishment of the I. O. E. as a company dominated organization, reinstatement with back pay of two discharged employees and reimbursement of employees for deductions from wages of amounts paid the I. O. E. under a check-off agreement. The Board asks that the order be enforced. The case was before us two years ago, when we entered an order setting aside the order of the Board theretofore entered. Virginia Electric & Power Co. v. N. L. R. B., 4 Cir., 115 F.2d 414. The Supreme Court granted certiorari and reversed our decision with direction that the case be remanded to the Board for redetermination of the issues in the light of that Court's opinion. N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. This was done, and the case was heard by the Board on the record made at the prior hearing, without the introduction of additional testimony.

■■■■ The portion of the order directing disestablishment of the I. O. E. is assailed on the ground that it is not supported by substantial evidence. This, however, was the ground of our former decision setting aside the Board's order; and the reversal of that decision by the Supreme Court precludes another holding that the identical evidence is insufficient. The case is precisely similar to that in which an appellate court reverses a non suit or judgment upon a verdict directed for defendant on the ground of the insufficiency of the evidence. In such case the lower court upon remand is not limited in the reception of evidence, nor is it precluded from rendering any judgment that may be appropriate upon the new trial granted; but, as to the effect of the evidence passed upon by the appellate court, the decision of that court is final and the lower court may not again grant a non suit or direct a verdict upon the same or substantially similar evidence. To that extent the decision of the appellate court becomes the law of the case. 3 Am.Jur. 553; 5 C.J.S., Appeal and Error, § 1964, p. 1508; Thompson v. Maxwell Land-Grant Co., 168 U.S. 451, 456, 18 S.

Ct. 121, 42 L.Ed. 539; Dodd v. Union Indemnity Co., 4 Cir., 32 F.2d 512; Priester v. Southern R. Co., 4 Cir., 6 F.2d 878; Carpenter v. Durell, 6 Cir., 90 F.2d 57; Claiborne-Reno Co. v. E. I. DuPont de Nemours & Co., 8 Cir., 77 F.2d 565; Gulf, Mobile & Northern R. Co. v. Hardy, 151 Miss. 131, 117 So. 536, 61 A.L.R. 1073; Morehouse v. Everett, 141 Wash. 339, 252 P. 157, 58 A.L.R. 1482; Mahany v. Kansas City Railways Co., Mo.Sup., 254 S.W. 16, 29 A.L.R. 817; White v. Int. Text Book Co., 156 Iowa 210, 136 N.W. 121, 42 L.R.A., N.S., 346. There is nothing in Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221, upon which the company relies, to indicate that the same rule is not to be applied to decisions on appeal to the Supreme Court from judgments of the Circuit Courts of Appeals dealing with orders of the Labor Board. That case involved no consideration of the sufficiency of the evidence by the Supreme Court, but merely the power of the Circuit Court of Appeals to remand a case to the Board for the purpose of setting aside its findings and order and making its decision and order upon reconsideration. That is a very different matter from directing, as was done here, that the case be remanded for the Board to clarify its findings so as to show whether in reaching its conclusion it had or had not acted upon an erroneous theory of law.

In our former opinion we discussed at length the very matters upon which petitioners now rely and reached the conclusion that the order of disestablishment was not supported by substantial evidence. It was our decision, and not that of the Board, which was reviewed by the Supreme Court; and proper respect for that court requires the assumption that it would not have reversed a decision based on the insufficiency of the evidence unless it had deemed that decision erroneous. Certainly the court would not have remanded the case for clarification of the findings, if the evidence before it, as we held, was insufficient to sustain any finding of domination. The case is not one involving insufficient findings where there is a remand in order that sufficient findings may be made. There was a clear finding of company domination accompanied by a comprehensive finding of evidentiary facts; but, because of expressions used by the Board, the Supreme Court was not certain that the finding of domination was not based upon certain of these evidentiary facts alone, i.e. the bulletin of

April 26 and the speeches of May 24, without their being considered in connection with the other evidence. It was not suggested by anyone that the case be remanded for the taking of further evidence; and it is inconceivable that the court would have reversed our decision and directed further action by the Board unless it had been of opinion that the evidence was such that the Board could properly take action upon it and had intended so to decide.

While the court did not say in so many words that there was substantial testimony in the record which would justify Board action, it was made very clear that the Board would have been sustained if its order had been based on the totality of the evidence and there had been no question as to its being based solely on the bulletin and the speeches. In this connection the court said: "The command of section 10(e) of the Act [29 U.S.C.A. § 160(e)] ·that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive' precludes an independent consideration of the facts. Bearing this in mind we must ever guard against allowing our views to be substituted for those of the agency which Congress has created to administer the Act. But here the Board's conclusion that the Independent was a Company dominated union seems based heavily upon findings which are not free from ambiguity and doubt. We believe that the Board, and not this Court, should undertake the task of clarification." [314 U.S. 469, 62 S.Ct. 348, 86 L.Ed. 348.]

After pointing out that the Board had found the bulletin and speeches had interfered with, restrained and coerced the employees, and that the company contended that this finding was repugnant to the First Amendment, the Court held that the Act did not enjoin the employer from expressing his views on labor policies or problems, but that conduct evidenced in part by speech might amount to coercion in connection with other circumstances. It then went on to say: "If the Board's order here may fairly be said to be based on the totality of the Company's activities during the period in question, we may not consider the findings of the Board as to the coercive effect of the bulletin and the speeches in isolation from the findings as respects the other conduct of the company. If the Board's ultimate conclusion is based upon a complex of activities, such as the anti-union background of the Company, the activities of

Bishop, Edwards' warning to the employees that they would be discharged for 'messing with the C. I. O', the discharge of Mann, the quick formation of the Independent, and the part which the management may have played in that formation, that conclusion would not be vitiated by the fact that the Board considered what the company said in conjunction with what it did."

And, as showing that the case was remanded merely for a determination by the Board as to whether or not domination was shown by the evidence without reference to the bulletin and speeches, or whether or not it was shown by the whole course of conduct evidenced in part by these utterances, and that these questions were held to be questions for the Board upon the evidence, the following portion of the opinion is pertinent:

"It is clear that the Board specifically found that those utterances were unfair labor practices, and it does not appear that the·Board raised them to the stature of coercion by reliance on the surrounding circumstances. If the utterances are thus to be separated from their background, we find it difficult to sustain a finding of coercion with respect to them alone. The bulletin and the speeches set forth the right of the employees to do as they please without fear of retaliation by the Company. Perhaps the purport of these utterances may be altered by imponderable subtleties at work which it is not our function to appraise. *Whether there are sufficient findings and evidence of interference, restraint, coercion, and domination without reference to the bulletin and the speeches, or whether the whole course of conduct evidenced in part by the utterances was aimed at achieving objectives forbidden by the Act, are questions for the Board to decide upon the evidence.*

"Here we are not sufficiently certain from the findings that the Board based its conclusion with regard to the Independent upon the whole course of conduct revealed by this record. Rather it appears that the Board rested heavily upon findings with regard to the bulletin and the speeches the adequacy of which we regard as doubtful. We therefore remand the cause to the Circuit Court of Appeals with directions to remand it to the Board for a redetermination of the issues in the light of this opinion." (Italics supplied.)

The Board has reappraised the evidence in the light of the Supreme Court's opinion and has found interference, restraint, coercion and domination on the whole evidence and in consideration of the whole "complex of activities" shown by the evidence. This was done, not by the same Board, but by a Board with a completely changed membership. It was done, not pro forma, but in a careful appraisal of the circumstances relied on. In the first decision of the Board, the conclusions regarding the I. O. E. were contained in two of the printed pages of the record before us. In the last decision, these conclusions cover more than fourteen pages, in which the Board's evaluation of the circumstances is fully set forth. With respect to the April 26 bulletin, the Board states its conclusions as follows: "As regards the April 26 bulletin, we are not unmindful of the respondent's argument that its reference to the employees' right to join the union of their choice and its statement that no employee would suffer because of his membership, assured the employees of its impartiality, and that hence the employees could not have been restrained in their choice of representatives by any statement contained in the bulletin. We do not agree, however, that the respondent's brief reference to the employees' rights under the Act rendered the employees wholly free with respect to joining unions. On the contrary, in view of the respondent's past hostility to labor organizations, and in view of the timing of the bulletin, after nationally affiliated organizations had attempted to organize the employees and at a time when the Supreme Court decisions sustaining the validity of the Act rendered further attempts imminent, we believe that the employees could not fail to be discouraged from joining 'national' labor organizations by the respondent's action in posting the bulletin, which, as a whole, so clearly showed the respondent's opposition to their taking such a step. The respondent's subsequent activities, including its successful effort to effect the formation of a company-wide organization and the discharge of Mann because of his opposition to such an organization, cast revealing light on the respondent's motives in posting the bulletin. Viewing the bulletin in the light of the background in which it was posted and the respondent's subsequent activities, we find the bulletin clearly coercive. We accordingly find that the posting of the bulletin was an integral part of the respondent's conduct, and as such, interfered with, restrained, and coerced the respondent's employees in the exercise of the rights guaranteed in sec. 7 of the Act [29 U.S. C.A. § 157]."

That the speeches were appraised in the light of the other evidence, and not held coercive without reference thereto appears from the following passages of the conclusions:

"We cannot agree that the message left the employees the complete and unfettered freedom of choice of representatives contemplated by the Act. Evaluating the message as a whole in the light of the respondent's long-standing opposition to the organization of the employees, the anti-union activities of Superintendent Bishop, the bulletin of April 26 appealing to the employees to ignore the overtures of the organizers of nationally affiliated organizations, the discharge of Mann for advocating affiliation with a 'national' union, and the respondent's subsequent support of the proponents of the I. O. E. and interference with the activities of the adherents of nationally affiliated organizations, and giving due regard to the sensitivity of employees to even subtle expressions of preference on the part of their employers, we find that the respondent, in urging upon the employee representatives the formation of a bargaining agency of their 'own,' impaired the employees' free choice of representatives, notwithstanding the respondent's reference in the message to the employees' rights under the Act.

"Upon all the facts, we are convinced and find that the May 24 meetings were arranged and the respondent's message to the employees was prepared for the purpose of bringing about the formation of a company-wide unaffiliated organization. The messages themselves contain, as we have found above, a thinly disguised plea for the formation of just such an organization. Had not the respondent been determined to effect the formation of such an organization there would have been no lawful occasion for the respondent's arranging the May 24 meetings as it did, for it had only recently 'advised' the employees concerning their rights under the Act. The whole procedure of the May 24 meetings was obviously chosen with a view to facilitating the formation of the

desired organization. Not satisfied with the bulletin board method of transmitting messages to the employees, which the respondent had utilized in the past, this time the respondent delivered its message personally to representatives of the employees chosen at the respondent's behest. This strategy enabled the respondent to obtain a spokesman for its project in almost every department. The device of withdrawing from the meeting places and suggesting that the employee representatives remain for further discussion, we believe was intended to give them an opportunity to formulate their plans before consulting with their constituents and thus to expedite the formation of an organization. We conclude, therefore, that the respondent arranged the meetings and urged upon the employees the formation of a company-wide unaffiliated organization because it feared the course the employees might pursue if the respondent did not intervene, that the respondent did so in a further effort to control the exercise by its employees of their right to self-organization, and that in doing so the respondent injected itself into a sphere of activity reserved exclusively to its employees and thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in sec. 7 of the Act."

After summarizing the evidence and evaluating its several features at greater length than we would be justified in quoting here, the Board states its conclusion with respect to the I. O. E. as follows: "Upon all the facts summarized above, we conclude that the I. O. E. was not the result of the employees' free choice; that it was initiated in response to the urgings of the respondent at the May 24 meetings to set up their 'own' organization; that the respondent's support of the organization during the critical formative period and its consistent opposition to nationally affiliated organizations are largely responsible for the adherence of the employees to the organization; and that the contract with the I. O. E. granting a closed shop and the check-off of the I. O. E. dues marked the climax of the respondent's efforts to erect an unaffiliated organization as a bulwark against nationally affiliated organizations. We find that the respondent has dominated and interfered with the formation and administration of the I. O. E. and has contributed support to it, and has in this and the other respects set forth above interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in section 7 of the act."

And apart from the doctrine of the "law of the case", we feel that in the light of the clear intimation of the Supreme Court as to the sufficiency of the evidence to sustain a finding of domination we would not be justified in holding it insufficient. In referring in the language above quoted to "the anti-union background of the company, Edwards' warning to the employees that they would be discharged for 'messing with the C. I. O.', the discharge of Mann, the quick formation of the Independent, and the part which the management may have played in that formation", the court ascribed probative value on the issue of domination to these circumstances which we do not feel that we should ignore. The last decision of the Board considers these in connection with the bulletin and speeches and points to other probative features of the testimony not fully appraised in its former decision. We are admonished in the Supreme Court's decision that "we must ever guard against allowing our views to be substituted for those of the agency which Congress has created to administer the Act"; and other recent decisions of the court have emphasized that findings of the Board are binding, not merely with respect to evidentiary facts, but also with respect to conclusions of fact which may reasonably be drawn from them. Cf. Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

Having reached this conclusion, we feel that we should express it as an additional ground of decision, to the end that there may be a final decision of the case by the Supreme Court, if certiorari is granted, whatever that court's view may be as to the applicability of the doctrine of the "law of the case". The fact that the conclusion is at variance with that reached by us on the former appeal does not militate against it. We did not then have the benefit of the analysis of the evidence contained in the Board's last decision, nor did we have the light of the Supreme Court's opinion. Our duty is to decide the question now presented in the light of the present situation and not that which existed at the time of the former appeal; and if, in

consideration of the subsequent decisions of the Supreme Court and the fuller discussion of the evidence by the Board, it appears that we were mistaken in applying to the record before us standards which the Supreme Court prescribes, that mistake can furnish no precedent for present action. We unhesitatingly admit and correct error, whether of law or fact, when pointed out by counsel on petition for rehearing. We should not hesitate to do so, when the error is pointed out by opinions of the Supreme Court.

■■ Little need be said as to the discharges. As to the discharge of Mann, if the evidence of background has probative value on the issue of company domination, it is unquestionably sufficient to sustain the Board's finding as to his discriminatory discharge. See our recent decision in Hickory Chair Mfg. Co. v. N. L. R. B., 4 Cir., 131 F.2d 849, decided November 12, 1942. The finding that the I. O. E. was company dominated brings within the category of unfair labor practices the discharge of Staunton because he would not become a member thereof in accordance with the closed shop agreement.

■ With respect to that portion of the order which directs reimbursement of employees for amounts paid to the I. O. E. under the check-off provision of the contract, we have a situation where, under contract with a company dominated union, the company made deductions from wages and paid them to the union. It is true that each employee, in his application for membership in the I. O. E., authorized that this be done; but as the contract contained a closed shop provision, he had no option but to submit to the deduction if he desired to retain his employment. Under such circumstances, the check-off was unquestionably an unfair labor practice; and the Board has found that reimbursement of employees for the wages thus deducted is necessary to expunge it. With respect to this matter, the Board said: "We are of the opinion that, under the circumstances of this case, the respondent should be ordered to reimburse each employee for any amounts which the respondent has deducted from his wages for dues and assessments in the I. O. E. The respondent concluded a closed-shop contract with the I. O. E., a company-dominated organization, thus compelling its employees to become and remain members of the illegal organization. Employees were in fact discharged because they refused to join the I. O. E. The check-off provision, a device by which the respondent assured the financial stability of the company-dominated organization, could no more be avoided by the employees than could the compulsory membership requirement. The by-laws of the I. O. E. required its members to execute check-off authorizations under penalty of being dropped from membership in the I. O. E., and thereby, under the closed-shop provision, from their jobs. We find that the monies thus deducted from the wages of the employees constituted the price of retaining their jobs, a price coerced from them for respondent's purpose of supporting and maintaining the organization which respondent had dominated in order to thwart bona fide representation. We further find that, as a result of the imposition of the illegal closed-shop and check-off requirements, the employees suffered a definite loss and deprivation of wages equal to the amounts deducted from their wages and paid over to the I. O. E. It is appropriate that the employees be made whole by reimbursement of amounts exacted from them for illegal purposes. We find that, in these circumstances, the effects of the unfair labor practices may be fully remedied and the purposes and policies of the Act may be completely effectuated only by restoring the status quo. Hence, we shall order the respondent to reimburse its employees for the amounts deducted from their wages for dues and assessments in the I. O. E."

■ Under section 10(c) of the National Labor Relations Act, 49 Stat. 454, 29 U.S.C.A. § 160(c), the Board has the power, upon a finding of unfair labor practice, not only to require the person guilty thereof to cease and desist therefrom, but also to require him "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]". It is clear, we think, that such affirmative action is not limited to "reinstatement of employees with or without back pay". As said by Judge Arant in the dissenting portion of his opinion in N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 116 F.2d 816, 821, "the specification did not add to the Board's power, but illustrated the kind of an affirmative order the Board could make". An order requiring reimbursement of the

check-off under such circumstances as exist here clearly falls within the power and is closely analogous to orders directing the payment of back wages in case of discriminatory discharge. In the case of discriminatory discharge, the employee has lost wages as the result of an unfair labor practice, and the payment of back wages is ordered to wipe out so far as possible the effect of the practice and effectuate the purposes of the act. Here, the employees have just as certainly lost the wages deducted under the check-off agreement, which because of the payment to a company dominated union is also an unfair labor practice. It is for the Board, and not for us, to say what affirmative action is necessary to expunge the effect of such practice and effectuate the purposes of the act. Phelps-Dodge Corp. v. N. L. R. B., 313 U. S. 177, 194, 61 S.Ct. 845, 85 L.Ed 1271, 133 A.L.R. 1217; N. L. R. B. v. Link Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 73, 82, 61 S. Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

It is true, of course, that the Board may not, under the guise of effectuating the purposes of the act, impose penalties or adjudicate tort claims. Cf. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. An order directing reimbursement of wages deducted pursuant to an unfair labor practice, however, does not fall within either of these categories. As said by Judge Hutcheson in Agwilines, Inc., v. N. L. R. B., 5 Cir., 87 F.2d 146, 151: "The statute authorizes reparation orders not in the interest of the employee, but in the interest of the public. A cease and desist order operating retrospectively is not a private award, operating by way of penalty or of damages. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning; practices as to which, because forbidden in the interest of industrial amity, and therefore peace, Congress has the right to eradicate them as from the beginning."

We are advertent to the decisions refusing to enforce orders of the Board directing reimbursement of wages deducted under the check-off.[1] We are not impressed, however, with the reasoning of those which proceed upon the theory that the action of the Board amounts to the imposition of a penalty or the adjudication of a tort claim beyond its powers or that its action must be set aside because contravening equitable principles. We note that in only three of the cases [2] was there a check-off under an agreement involving a closed shop, that two of these were from one circuit, and that the first of these two called forth a dissenting opinion more convincing to us than the opinion of the court.[3] And in the case of Kansas City Power & Light Co., Judge Stone, speaking for the Circuit Court of Appeals of the 8th Circuit, points out that while the case there involved did not justify an order of reimbursement, situations might arise which would justify such order, and distinguished from the case before him such a case as we have here, where the company initiated, formed and promoted the organization and assured its support by agreeing to the check-off. Judge Stone said in that case: "There may be situations which would justify such an order. This is not one. The proposition for a check-off as a method of collecting dues originated with the Association, was opposed by the company and conceded only upon demand of the Association. Such dues were fixed solely by the Association and used solely in its activities. This is not an instance where the company initiated, formed and promoted an organiza-

[1] Western Union Telegraph Co. v. N. L. R. B., 2 Cir., 113 F.2d 992; Corning Glass Works v. N. L. R. B., 2 Cir., 118 F.2d 625; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 116 F.2d 816; N. L. R. B. v. United States Truck Co., 6 Cir., 124 F.2d 887; N. L. R. B. v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984; A. E. Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868; Reliance Mfg. Co. v. N. L. R. B., 7 Cir., 125 F.2d 311; Kansas City Power & Light Co. v. N. L. R. B., 8 Cir., 111 F.2d 340; N. L. R. B. v. Southwestern Greyhound Lines, Inc., 8 Cir., 126 F.2d 883; N. L. R. B. v. Continental Oil Co., 10 Cir., 121 F.2d 120.

[2] N. L. R. B. v. West Kentucky Coal Co., supra.; Kansas City Power & Light Co. v. N. L. R. B., supra; N. L. R. B. v. J. Greenebaum Tanning Co., supra.

[3] Opinion of Judge Arant in the West Kentucky Coal Co. case, supra.

tion and assured its support through a check-off. It is an instance of the effect of a prior organization (the Plan) carrying over an influence which might affect the entire freedom of employees to choose their bargaining agent." [111 F. 2d 348.]

It is argued that there is no occasion for reimbursement since the dues were paid to the I. O. E. on the order of the employees; but this circumstance loses significance when it is remembered that the I. O. E. is found to have been initiated and promoted by the company for the purpose of defeating that collective bargaining which the Act contemplates, and that the employees were obliged to pay dues to it as a means of retaining their employment. It is argued, also, that the employees got the benefit of the check-off as the result of the payment to the union of which they were members. The answer, of course, is that the Act proceeds upon the theory that the maintenance of a company dominated union is not a benefit but a detriment to the employees who are members of it. And it is no answer to this to point to wage increases and other benefits secured as a result of contracts made by the company dominated union; for it is manifestly impossible to say that greater benefits might not have been secured if the freedom of choice of a bargaining agent had not been interfered with. It must be remembered, however, as above indicated, that it is not the redress of wrongs of employees which is the purpose of the order complained of, but the expunging ab initio of the effects of an unfair labor practice. The mere disestablishment of the company dominated union does not accomplish this result. It is accomplished only when action is taken which will place the parties, so far as possible, where they would have been if the unfair labor practice had not occurred. One means of doing this is to reimburse the employees for anything they may have been deprived of as a result of it. Cf. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 12, 61 S.Ct. 77, 85 L.Ed. 6. The whole matter was well summed up by Judge Arant in the dissenting portion of his opinion in N. L. R. B. v. West Kentucky Coal Co., supra, 116 F.2d 816, 820, 821, as follows: "The order to reimburse for wrongful checkoffs, though not specifically mentioned in the Act, is analogous to the order to make employees whole by the payment of back wages and promotes the policies of the Act in the same manner. The writer thinks reinstatement with back pay would have been authorized by § 10(c) even if it had not been specified; the specification did not add to the Board's power, but illustrated the kind of an affirmative order the Board could make. A proceeding before the Board is not an action at law, and the Board's order does not redress wrongs to individual employees. Though the order sometimes provides for deductions from back pay to the extent of earnings between dismissal and reinstatement, no case has been noted in which the employer was allowed to deduct an amount the employee *might* have earned had he used reasonable diligence to find another job. The wrongful checkoff of dues is neither more nor less tortious than wrongful dismissal; in neither case is there an inquiry as to extent of injury, as the Second Circuit rightly insists there should be in tort actions. The truth is that reinstatement of the employee and payment for time lost are remedies not known to the common law but created by statute. They 'are requirements imposed for violation of the statute and are remedies appropriate to its enforcement.' Mr. Chief Justice Hughes, in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893, 108 A.L.R. 1352. 'The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends.' Hutcheson, J., Agwilines, Inc. v. N. L. R. B., 5 Cir., 87 F.2d 146, 150."

For the reasons stated, the petitions to set aside the Board's order will be denied and the order will be enforced.

Order enforced.

SOPER, Circuit Judge (dissenting in part).

I concur in the result reached by the court in its opinion except insofar as it approves that part of the order of the Board which requires the Power Company to reimburse its employees for all of the dues deducted from their wages for the benefit of the independent organization. The argument in favor of the order is

that since the checkoff was associated with the closed shop, the monies deducted from the wages of the men constituted payments made by them under the fear of losing their jobs; and that repayment is necessary to offset the coercive measures of the company and to effectuate the purposes of the Act. Similar arguments have been rejected by five Circuit Courts of Appeals in every case in which the exercise of the power has been attempted.

The facts in the present case in this regard are that the closed shop and checkoff were forced upon the company against its will by the independent organization; that no employee now seeks the return of his money; and that the company received no financial or other benefit from the payments, since they were turned over to the independent organization and used by it in successful efforts to secure substantial advantages for the employees in wages and working conditions. Under these circumstances there is no justice in ordering the return of the money for which the men have received their money's worth. Nor is there merit in the contention that the money should be returned because it was paid under compulsion. There is an element of duress in every closed shop wherein workmen are compelled to recognize the union and to pay the required dues, but these conditions are considered lawful because they are imposed upon the employees by their own action. There is no greater compulsion in the case of a company dominated union, when the closed shop and checkoff fees result from the voluntary action of the men and are accepted by the company against its desire in order to preserve industrial peace. It may be added that there is no greater reason to require a return of the wages checked off in this case than to recompense employees in every case for dues paid directly to a company union.

The effect of this provision of the Board's order is not to effectuate the policies of the Act, for that is done completely by the disestablishment of the independent organization whereby the freedom of the employees to choose their own representatives is made secure. The effect is merely to obtain the deterrent influence that is expected to flow from the imposition of a penalty. But the Supreme Court has held that the Board has no power to inflict punishment for its deterrent effect. In Republic Steel Corp. v. Labor Board, 311 U.S. 7, 11, 12, 61 S.Ct. 77, 79, 85 L. Ed. 6, the court, speaking of the power of the Board to take such affirmative action as will effectuate the policies of the Act, said:

"This language should be construed in harmony with the spirit and remedial purposes of the Act. We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. We have said that 'this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.' We have said that the power to command affirmative action is remedial, not punitive. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 235, 236, 59 S.Ct. 206, 219, 83 L.Ed. 126. See, also, National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267, 268, 58 S.Ct. 571, 574, 575, 82 L.Ed. 831, 115 A.L.R. 307. We adhere to that construction.

"In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end."