**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 294, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

No. 207, Docket 25827.

United States Court of Appeals Second Circuit.

Argued Feb. 8, 1960.

Decided April 4, 1960.

On Rehearing June 17, 1960.

George Schatzki, Atty., N.L.R.B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., on the brief), for petitioner.

Before MOORE, Circuit Judge, and SMITH and HERLANDS, District Judges.

J. JOSEPH SMITH, District Judge.

The National Labor Relations Board, pursuant to the provisions of the National Labor Relations Act, 29 U.S.C.A. § 160(e), petitions this court for enforcement of a Board order issued against respondent union enjoining union recognition without a majority designation in an election, enjoining a union membership agreement, and enjoining coercion of employees in organization, and requiring repayment of checked-off dues, fees and assessments, and the posting of the usual notices.

On December 18, 1956 the Company and the Union entered into a collective bargaining agreement which recognized

the Union as the exclusive bargaining agency for all employees at the Company's Waterford, New York, warehouse excluding office employees, watchman, permanent salaried supervisors, bakery employees, trucking department employees, and inspectors. The agreement required that as a condition of employment all employees covered by the agreement shall within the statutory grace period become members of the Union and remain members in good standing during the term of the contract, and also contained a check-off provision.

In the Fall of 1956 the Union had renewed a campaign, which it had pursued intermittently since 1954, to organize the employees at the Company's Waterford, New York, warehouse. In late November it sought recognition as the representative of these employees and threatened the Company with a strike and picketing unless the Company entered into a collective bargaining agreement with it. On December 5, 1956, a meeting was held in Albany attended by various representatives of the Company and the Union, including Bernard A. Lubeck, who is in charge of labor relations for the Company, Robert L. Hood, the Company's counsel, Nicholas M. Robilotto, president of Local 294, and Harry Pozefsky the Union's counsel. The Union's representatives indicated that they had in their possession designation cards signed by a majority of the Company's employees and agreed to produce them for inspection. The meeting was thereupon adjourned to the Union's offices where the Company's representatives were shown a typewritten sheet listing the employees who had signed cards for the Union as well as the cards themselves. A total of 45 cards was produced which the Company's representatives checked against its payroll records. Four of the cards were found to have been signed by persons no longer in the Company's employ and 3 by persons who were working in classifications not included within the proposed bargaining unit. With respect to the remaining cards, the Company's

representatives were uncertain as to the authenticity of the signatures on 3 and were unable to make a comparison of the signatures on 2 others because they did not have specimen signatures of these employees with them. In addition, the Company's representatives questioned the validity of 8 cards which bore dates more than 12 months old. Thus, including all doubtful cards, the Union had 38 authorizations from employees who were working in the classifications for which it was seeking recognition. At the time there were 101 employees in the proposed bargaining unit. The Company's representatives therefore informed Robilotto that the Union did not represent a majority and that the Company would negotiate with the Union when it succeeded in obtaining designations from a sufficient number of employees. The Union's representatives indicated that it would only be a matter of a few days before they would have more designation cards. No one representing the Company at this meeting made a list of the names of the employees whose designation cards had been shown to them. Negotiations went on until December 18, with threats from the Union of a strike if it was not recognized. There were two meetings of the employees with Company officers or two sessions of the same meeting on that date. In the earlier part of the morning meeting, in response to a specific query, 69 out of 75 employees then present at the meeting expressed by a show of hands opposition to having the respondent Union as their representative. Thereafter, at the close of the meeting, the president of the Company said to the 75 employees that the Union had threatened a strike if it was not recognized and that the Union had the Company "over a barrel." Somebody asked the employees to show their loyalty to and confidence in the president and, at this point, all of the employees rose and applauded the president. Faced with heavy losses if struck at its busiest period, the Company capitulated and signed a union shop agreement, although on a show of hands the great majority of the employees had

indicated that they did not wish to be represented by Local 294. The employees had given a rising vote of confidence to the Company's president. However, Local 294 had never shown the Company designation cards signed by a majority of the employees. After the execution of the contract all the employees signed checkoff cards. Union dues were checked off and paid over to the Union until about August 3, 1957. On August 9, 1957 in a representation election in a voting unit including the warehouse workers and bakery workers, the Union was rejected and Robert E. Gray elected. On September 23, 1957 Gray and the Company entered into a collective bargaining agreement.

The Board's finding that on December 18, 1956, the critical date, the Union did not represent a majority of the 101 employees in the contractual unit is supported by its analysis of the evidence which was as follows:

| Number of Employees | Comment |
|---|---|
| 47 | They testified before the Board and it is undisputed that they never designated respondent before the contract was signed on December 18, 1956 to represent them. |
| 4 | They testified before the Board that they never authorized the respondent before December 18, 1956 to represent them. Their authorization cards were not signed in fact until after the execution of the contract. (Seguin, O'Leary, Brady and Bourgeois) |
| 5 | These did not testify. They signed authorization cards dated January 1957, i. e., after the contract had been signed. (Timm, Williams, Lawyer, McCullen and Sweet) |
| 3 | Although they were at one time members of respondent Union or a sister-Union, they did not designate the respondent as their representative. (Hotaling, Fluewelling and Hedden. Only Hedden testified) |
| 5 | They testified before the Board. They formerly designated respondent in 1955, but they did not wish respondent to represent them in 1956 and signed no authorization cards until after December 18, 1956. (Coon, Jansen, Fitzgerald, B. Westcott and S. Westcott) |
| 64 | |

◼ There is substantial basis in the record for the Board's conclusions that the Union did not represent a majority of the employees in the unit at the time the contract was entered into, and that the Company did not then have a sincere, good faith belief that Union did represent a majority. The Board's conclusion that the contract was in violation of the Act is clearly correct. N.L.R.B. v. Local 55, 10 Cir., 218 F.2d 226, 232, N.L.R.B. v. Henry Heide, Inc., 2 Cir., 219 F.2d 46, 48–49. The only question that remains is whether the form of the relief granted is within the powers of the Board and appropriate to the circumstances. The Board is authorized "to take such affirmative action including reinstatement of any employees with or without back pay, as will effectuate the

policies of this Act." We think that the portion of the decree requiring reimbursement is unduly harsh and penal in nature, not clearly bearing on the effectuation of the policies of the Act. Although the employer has consented to the order against it, in this check-off, the employer acted under pressure and with the support, even though in the case of the majority, also under pressure, of its employees. The Union involved is an existing local, not a shop union created by the illegal action in the case, not one whose disestablishment was the primary end sought by the Board, as in Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568. There was no enforcement or occasion for enforcement of the union shop provision of the contract. A substantial proportion of those who would be reimbursed were bona fide members before the illegal contract.

"The validity of reimbursement orders necessarily depends upon the peculiar circumstances of each * * * case." N.L.R.B. v. Adhesive Products Corp., 2 Cir., 258 F.2d 403, 409. The order here so far as it requires reimbursement is punitive in application and should be modified. Morrison-Knudsen Company, Inc. v. N.L.R.B., 2 Cir., 275 F.2d 914; Bldg. Material Teamsters Local 282, etc. v. N.L.R.B., 2 Cir., 275 F.2d 909; Western Union Tel. Co. v. N.L.R.B., 2 Cir., 113 F.2d 992; Corning Glass Works v. N.L.R.B., 2 Cir., 118 F.2d 625.

The order of the Board may be modified by deleting provisions I(b)(1) and II(b)(1) which are the reimbursement provisions of the order, and the corresponding paragraphs of the Notices to Employees, Appendices A and B, concerning reimbursement, and as so modified enforcement of the Board's order is decreed.

On Petition for Rehearing.

PER CURIAM.

■■ The Board moves for rehearing of that portion of the court's order which deleted reimbursement provisions from the Board's order. Its attack on that portion of the court's order is well taken. In each case the validity of reimbursement orders must be determined on the particular circumstances shown. N. L. R. B. v. Adhesive Products Corp., 2 Cir., 258 F.2d 403, 409. We held in the instant case that the reimbursement order was punitive in application, unduly harsh and penal in nature, since the union was not company dominated, there was no evidence of enforcement of the union shop provision of the contract, and a substantial proportion of those who would be reimbursed were bona fide members before the illegal contract. On reconsideration, we now hold that these facts are outweighed by the coercion of the majority by the illegal agreement and are not sufficient grounds to refuse enforcement of the reimbursement order in this case.

■■ It has been established that the union represented a minority of the employees. Although there was a substantial representation of the employees, nevertheless the actions of the union were not supported by the express approval of the majority of the employees at the time the contract was entered into. The employees signed the check-off authorization cards largely on the solicitation of the employer. They did so in face of a contract requiring membership in the union within thirty days and we think that sufficient coercion existed here to warrant the imposition of a reimbursement order against the union which was the ultimate beneficiary of the collections. We think that the illegal activity of the union was the substantial factor causing the previously uncommitted employees to authorize the check-off. Pressure by the minority union caused the employer to request the workers to show their loyalty to the company by consenting to the check-off. The means of coercion is somewhat different and less direct than that displayed in N. L. R. B. v. Revere Metal Art Co., 2 Cir., 280 F.2d 96. However, it is present here and is traceable to the union. Indeed, the existence of the thirty day membership

provision in a contract with a minority union has in itself been held sufficient to justify a reimbursement order. Dixie Bedding Mfg. Co. v. N. L. R. B., 5 Cir., 268 F.2d 901, 905. Since the reimbursement order vindicates public rights as well as private rights, Virginia Electric & Power Co. v. N. L. R. B., 1943, 319 U.S. 533, 543, 63 S.Ct. 1214, 87 L.Ed. 1568, the inclusion of this minority group should not preclude enforcement of the order. The majority was coerced by the illegal contract into paying the dues. The lack of enforcement may indicate only that the coercion was successful. Company domination of the union as in the Virginia Electric case, may be an additional factor to support a reimbursement order. It is not, however, a necessary element. Compare Lodge 1424 v. N. L. R. B., 105 U.S.App.D.C. 102, 264 F.2d 575, 582, reversed on other grounds, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832; N. L. R. B. v. Local 404, 1 Cir., 205 F.2d 99, 104 N. L. R. B. v. Spiewak, 3 Cir., 179 F.2d 695, 698.

The motion for rehearing is granted. Enforcement of the Board's order in full is granted.