**CAPITAL INVESTORS CO. et al.,**
**Appellees,**

v.

**EXECUTORS OF the ESTATE OF Arthur R. MORRISON, Appellant.**

**No. 73-1046.**

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1973.

Decided Sept. 12, 1973.

Joseph B. Hyman, Alexandria, Va. (Echols & Hyman on brief), for appellant.

John A. Beck, Washington, D. C., for appellees Frost and Dreisen.

Before BOREMAN, Senior Circuit Judge, and RUSSELL and FIELD, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is still another chapter in what has proved to be extended and protracted litigation arising out of a husband's unfortunate manipulation of his property in an apparent attempt to thwart his wife and representing efforts either of him or his estate to reclaim his property from the consequences of his own manipulations. The property involved consisted of two valuable tracts of real estate. One was located in Virginia, the other in Florida. The early stages of the proceedings related to the Virginia property. The background of that phase of the litigation, as well as the general nature of the proceedings and of Morrison's efforts in concealment have already been detailed in earlier opinions of this Court and need not be repeated again.[1] At this time, we are only concerned with the Florida property.

In May, 1963, Morrison,[2] the husband, acting in conjunction with the defendant James T. Benn, deeded his Florida property to Capital Investors Co. (hereinafter described as Capital) which was a corporate "shell", owned and controlled completely by Benn, and which may be considered legally as identical with Benn. Capital promptly sold the proper-

---

1. 360 F.2d 462 (4 Cir., 1966); 387 F.2d 591 (4 Cir., 1967); and 453 F.2d 1365 (4 Cir. 1972).

2. Morrison died in 1969 and his executors were properly substituted in his place.

ty in June, 1963, to Do-Mor, Inc., a Florida corporation, which in payment executed four promissory notes of even date with the purchase, naming Capital as original payee. The notes were secured by a mortgage over the real estate sold. The controversy between the parties relates to only two of these notes, one in the principal amount of $100,000 payable in two equal installments on June 21, 1964, and June 21, 1965, and the second in the sum of $225,000, payable within sixty days, or August 21, 1963. After delivery, the notes were shifted about by Benn among three corporations, which represented his *alter egos* and were completely under his control and ownership. It is unnecessary to detail such manipulations since they have no determinative bearing on the issues in this phase of the litigation. In March, 1965, however, when both notes were in default and after maturity,[3] Benn, through one of his "shell" corporations endorsed the two notes in question to the defendant Frost, who initially had the notes endorsed over to a nominee, Peters and Company, a real estate brokerage firm headed by Frost's son-in-law, and later in favor of the defendant Dreisen, as nominee. Dreisen, however, later acquired from Frost a half-interest in his purchase. In December, 1964, prior to the negotiation of the notes to Frost, the District Court had directed that the proceedings should focus on the ownership of the Florida property, or, if sold, its proceeds, and directed that the parties should file specific statements of their claims in and to the property or its proceeds. In accordance with this judicial direction, Morrison submitted in February, 1965, motion for leave to file his counterclaim against Capital and Benn for the purpose of establishing his claim to the Florida property or, if sold, to the proceeds therefrom. This motion was granted in

March, 1965, a few days after Benn had assigned the notes to Frost. Thereafter, Benn's corporate "shell", which had made the transfer of the notes to Frost's nominee, filed bankruptcy proceedings, listing these notes as corporate assets "subject to a pledge."

Little progress was made in disposing of the issues surrounding the ownership of the Florida property. The proceedings, it seems, were shifted about among judges after the District Judge who originally was in control was elevated to the Circuit Court. In December, 1970, however, Honorable Richard Kellam, District Judge, to whom the case was ultimately assigned, began to press vigorously the proceedings towards a conclusion. He accordingly, in December, 1970 fixed a hearing to dispose of all outstanding issues, including particularly that involving the Florida property. Notice of this hearing and of the right of any party to proffer any claims he might have to this property was given all parties. After a full hearing in March, 1971, pursuant to the notice, the Court issued its opinion, dated May 4, 1971 in which it found specifically that Capital had not "paid any consideration for the Florida properties" and that Capital "held the assets described, transferred and conveyed as a constructive or resulting trustee. All of the properties were owned by Mr. Morrison. No consideration was paid by Capital. Mr. Morrison is entitled to have all of the property returned to him, or the proceeds therefrom, subject to the right of any bona fide transferee." In this opinion, it described the notes as "subject to a pledge", thereby indicating uncertainty of the nature of any claim of Frost and Dreisen, who were not at the time parties to the action, in and to the notes. This finding was confirmed in the judgment of the Court dated June 21, 1971.

---

3. Only the first installment on the $100,000 was past due but the Uniform Commercial Code declares that a "purchaser has notice that an instrument is overdue if he has reason to know (a) that any part of the principal amount is overdue * * *." Section 3-304(3). This seems to have been the rule under the NIL. Note, 170 A.L.R. 1029; United States v. Capen (D.C.Vt.1944) 55 F. Supp. 81.

Thereafter, the present controversy over the ownership of the two notes in question quickly developed between the estate of Morrison, relying on the judgment giving it beneficial equitable ownership of the Florida property "or the proceeds therefrom," and Frost and Dreisen claiming as endorsees and transferees for value without notice of the claims of Morrison. After a hearing on the respective claims, the District Court filed its decree "in equity" concluding, on the basis of its balancing of the equities of the parties, that the rights of Frost as a purchaser for value without notice were superior to those of the estate, even though the estate be deemed to have a constructive trust in and to the notes. Predicated on those findings, it sustained the claim of the defendants Frost and Dreisen to the notes. In so ruling, the Court gave no consideration in its opinion to the Uniform Commercial Code and its applicability to the issues between the parties. The estate has appealed. We reverse.

█ █  The notes in dispute are negotiable instruments and the transferability of such notes, as well as the rights flowing from such transfers, are to be determined by the legal principles unique to negotiable instruments. This is so, though the notes are secured by a real estate mortgage.[4] In ascertaining what the rights attaching to a negotia-

tion of a negotiable instrument are, the Courts are to apply the law, not of the place of payment, but of the place where the negotiation occurred.[5] The transfer of the notes in question to Frost occurred in the City of Washington. At the time of that transfer, the applicable law was represented by the Uniform Commercial Code, earlier adopted in that jurisdiction. All of this the defendants Frost and Dreisen conceded on oral argument. Nor could they have taken any other position in view of the clarity of the law. The District Court, in its decision from which this appeal is taken, however, gave no consideration to the provisions of the Uniform Commercial Code and erroneously applied general equitable principles applicable to the transfers of non-negotiable instruments in resolving the rights of the parties.

█  Broadly speaking, the Uniform Commercial Code divides the purchasers of negotiable paper into two categories; and, following the ancient maxim, *nomen est numen*,[6] it fixes the rights of a purchaser by his ·classification within those categories. The two categories are "holder in due course" and one not a "holder in due course." And the Code provides a simple test for ascertaining within which category a purchaser of a negotiable paper falls. To be a "holder in due course," one must

---

4. This is made crystal clear in the Uniform Commercial Code. *See* Sections 3–105(2)(a) and 3–112(1)(b) of the Code. 11 Am.Juris.2d Section 201, at 230, summarizes the rule under the Code thus:

"* * * The Commercial Code declares the negotiability is not affected by a statement that collateral has been given to secure obligations, either on the instrument or otherwise, of an obligor on the instrument, and an order or promise is not made conditional by the fact that the instrument states that it is secured."

This rule was the majority rule even before the adoption of the Code. Marine Bank v. Kalt-Zimmers Co. (1934) 293 U.S. 357, 363, 55 S.Ct. 226, 79 L.Ed. 427; Gerrish v. Atlantic Ice & Coal Co. (5th Cir. 1935) 80 F.2d 648, 650; Fidelity Trust Co. v. Mayhugh (5th Cir. 1920) 268 F. 712, 716–717;

First National Bank v. Valentine (1970), 62 Misc.2d 719, 309 N.Y.S.2d 563.

5. United States v. Guaranty Trust Co. (1934) 293 U.S. 340, 345–346, 55 S.Ct. 221, 79 L.Ed. 415; Queensboro Nat. Bank of City of New York v. Kelly (2 Cir. 1931) 48 F.2d 574, 576; Restatement, Conflict of Laws 2d, Sec. 216. In *Guaranty Trust*, the Court said:

"But under settled principles of conflict of laws, adopted by both federal and state courts, the validity of a transfer of a chattel brought into a country by the consent of the owner is governed by its law; and that rule applies to negotiable instruments." (293 U.S. at 345–346, 55 S.Ct. at 223.)

6. Freely translated, this maxim is to the effect that "to name is to know or to decide."

have acquired the negotiable instrument before maturity and before default.[7] It is conceded that Frost acquired the notes in this case after maturity and with knowledge of default. It follows necessarily, then, that he was not a "holder in due course." The Uniform Commercial Code plainly provides that one not a "holder in due course," such as was Frost, takes the notes "subject to (a) all valid claims to it on the part of any person; * * *."[8] And the breadth of the phrase in the Code of "all valid claims. * * * on the part of any person" is stated in the Official Comment on the section to include "not only claims of legal title, but all liens, equities or other claims of right against the instrument or its proceeds. It includes claims to rescind a prior negotiation and to recover the instrument or its proceeds." The Official Comment goes further and states that this provision "includes all claims for rescission of a negotiation, whether based in incapacity, fraud, duress, mistake, illegality, breach of trust or duty or any other reason. * * * It includes claims of legal title, lien, constructive trust or other equity against the instrument or its proceeds." The Comment, also, makes clear that the provision applies to and limits the rights of "a bona fide purchaser" for value, provided he took "with notice that the instrument is overdue."[9] Since Frost took the notes with actual notice they

7. Sec. 3–302(1)(c), U.C.C.

The reason for this differentiation between rights acquired by one under an assignment before maturity and one after maturity was long recognized before the adoption of either the Negotiable Instruments Act or the Uniform Commercial Code. " 'Where a negotiable note is found in circulation *after it is due, it carries suspicion on the face of it. * * *' " (Emphasis in text). Osborn v. McClelland (1885) 43 Ohio St. 284, 1 N.E. 644, 651, quoting from 1 Daniel, Neg.Inst., (1st Ed.) § 782. A like idea was expressed in Vermilye & Co. v. Adams Express Company (1874) 88 U.S. 138, 144–145, 21 Wall 138, 22 L.Ed. 609, where the Court said that the past-due character of a negotiable instrument "should be a warning to the purchaser of such an obligation after its maturity to look to the source from which it comes, and to be cautious in paying his money for it."

*See, also,* Morgan v. United States (1884) 113 U.S. 476, 500, 5 S.Ct. 588, 597, 28 L. Ed. 1044:

"When transferred after it has become due, although not reduced to the rank of an ordinary chose in action, the legal title to which cannot pass by assignment or delivery, it carries on its face the presumption which discredits it, and deprives it of that immunity which, while the time for payment was still running, was secured to it in favor of a bona fide purchaser for value without actual notice of any defect, either in the obligation or the title."

8. Section 3–306, U.C.C.

9. Section 3–306(a), U.C.C.; 11 Am.Jur. § 486, at 550.

The Code made little real change in the rights of one not a holder in due course under the old law merchant, which was to the effect that one not a holder in due course

got by transfer only such title as his transferor had and, if some other person had legal or equitable title, such title would not be divested by the transfer. Morgan v. United States, *supra*, 113 U.S. at 491, 58 S.Ct. 588; Vermilye & Co. v. Adams Express Company, *supra*, 88 U.S. at 146–147, 21 Wall 138; Texas v. White (1868) 74 U.S. 700, 735, 7 Wall 700, 19 L.Ed. 227. In the latter case, the Court said:

" * * * We held in that case that the purchaser of coupon bonds, before due, without notice and in good faith, is unaffected by want of title in the seller, and that the burden of proof in respect to notice and want of good faith, is on the claimant of the bonds as against the purchaser.

* * * * *

"But these rules have never been applied to matured obligations. Purchasers of notes or bonds past due take nothing but the actual right and title of the vendors." In Morgan v. United States, *supra*, the Court said (at 491, 113 U.S. at 593, 5 S. Ct.):

"Purchasers of notes or bonds past due take nothing but the actual right and title of the vendors."

*See, also,* 11 Am.Jur.2d § 481 at 541–2:

"A holder who takes an instrument after its maturity has, under the NIL or law merchant, the status and rights, in general, of the holder of a non-negotiable instrument or of the assignee of a chose in action. That is, unless he holds through a holder in due course, he normally has nothing but the right and title of his transferor, is put upon inquiry and is chargeable with notice, and holds the instrument subject to defenses based on infirmities in the instrument or defects in title of the person transferring it to him."

were overdue and in default, he acquired only the right of his transferor, Benn, in and to the notes or their proceeds and his right to the notes was specifically subject to any constructive trust in and to the notes or their proceeds in favor of the estate and all references in the District Court's opinion to the rights of a "bona fide purchaser" for value were irrelevant. In short, the controversy between the parties resolved itself into the clear-cut question whether the estate had established its right to claim the notes as the beneficiary of a constructive trust in the notes or their proceeds. If it had, Section 3–306 was applicable and controlling.

██  In its May 4, 1971 opinion, the District Court found that the estate did have a constructive trust in the notes or their proceeds. The estate asserts this finding in the May opinion is conclusive on the rights of the parties and on the existence of a constructive trust in its favor. But Frost and Dreisen were not parties to the proceeding at the time this opinion was rendered and they claim they are not bound by that decree. The estate counters with the argument that the May finding binds both parties and those in privity with them, and one is in privity if, though not a party, he acquired his interest in the subject-matter of the controversy after the commencement of the action thereon. In amplification of this point, it argues that Frost's purchase of the notes was after the proceeding was begun, after the District Court in its ruling of December, 1964 had focused on the Florida transaction, and after the estate had filed its motion to raise by counterclaim its claim to the property or its proceeds. There is, it may be conceded, considerable authority in support of this contention of the estate. *See* Lamb v. Cramer (1932) 285 U.S. 217, 219, 52 S.Ct. 315, 76 L.Ed. 715; National Lead Co. v. Nulsen (8th Cir. 1942) 131 F.2d 51, 56, cert. denied, 318 U.S. 758, 63 S.Ct. 533,

87 L.Ed. 1131, 46 Am.Jur.2d Sec. 532 at 684; 1st Restatement of Judgments (1942) Section 89. But, under the special circumstances of this case, we do not regard the principle urged by the estate applicable. This is so, because the District Court in its May, 1971 opinion, though finding favorably to a constructive trust, limited that finding to the parties then before the Court and expressly reserved decision on the rights of any transferee of the notes.[10] And the estate did not except to this limitation by the Court on the effect of its finding of constructive trust, even though the Court specifically provided an opportunity to any party to the proceedings to submit "objections and exceptions to the order at Alexandria, Virginia, at 9:00 o'clock a. m. on June 21st, 1971." The District Court, in its opinion from which this appeal is taken, addressed itself to the claim advanced by the estate that the earlier finding in May, 1971 bound Frost and Dreisen even though not then parties, and emphasized that, while describing the notes as "subject to pledge" thereby indicating that even the Court was unsure of the nature of the claim of Frost and Dreisen, it had carefully refrained in its May, 1971 opinion from making "any ruling concerning the rights of Frost and Dreisen, or the validity of any assignment of the notes in question." In the light of this record and the obvious purpose of the District Court, so definitely expressed, that in its May opinion, it did not intend to rule on the rights of Frost and Dreisen, but specifically reserved judgment on their rights, it would seem entirely improper to apply to Frost and Dreisen any mechanical rule of privity so as to bar them from a right to be heard on the existence *vel non* of a constructive trust in favor of the estate in and to the notes. After all, the principle of privity is not to be automatically applied in all cases as a basis for *res judicata*; its application for such purpose requires

---

10. It is not an unusual course for a court to follow in adjudicating issues that might prejudice parties who are not before the court

to enter a provision saving the right of such parties. *See,* Ladd v. Stevenson (1889) 112 N.Y. 325, 19 N.E. 842, 844.

"careful examination into the circumstances of each case as it arises." Storm v. Nationwide Mutual Insurance Company (1957) 199 Va. 130, 97 S.E.2d 759, 762, 69 A.L.R.2d 849. On the basis of the "circumstances" of this case, the application of the principle, in our opinion, would not accord with fundamental fairness. The issue of a constructive trust in the notes in favor of the estate accordingly remains for resolution between the estate and the defendants Frost and Dreisen. The cause is remanded to the District Court to make appropriate findings on that issue on the record heretofore made before it, supplemented by any additional evidence either party may submit.

■ Though the case is being remanded for further proceedings, it is perhaps not amiss for us to note some additional points suggested by the parties in their arguments which we do not find dispositive of the cause as it is presently advanced. Thus, Frost and Dreisen suggested that the estate was foreclosed from maintaining any claim by a decree entered in a suit to quiet title to the Florida property filed by Do-Mor, in the state courts of Florida, and by a general release executed by Morrison in favor of Capital. Morrison was, it is true, a party to the suit to quiet title. That action, however, had nothing to do with the rights of Morrison to the notes given by Do-Mor to Capital. The issue in that suit to quiet title was Do-Mor's title, wich rested upon a deed executed by Capital in favor of Do-Mor. No one in the action questioned Do-Mor's status of a purchaser in good faith for value without notice; and, under such circumstances, the general equitable principles stated in Vicars v. Wei-

siger Clothing Co. (1917) 121 Va. 679, 93 S.E. 580, 581, as quoted in the opinion of the District Court, which apply to transfers other than those qualifying as negotiable instruments, sustained the claim of title of Do-Mor against any claim of Morrison. But Do-Mor's title to the real estate is entirely different from Frost's claim by virtue of an assignment after default to the notes in question. So far as the release is concerned—the other matter raised by Frost and Dreisen—it is the position of the estate that there was either a want or failure of consideration. While the District Court did not clearly rule on this contention of the estate, the fact that it did not predicate its conclusion on the release would suggest that it considered the position of the estate welltaken. The issue is, however, tied in to the question of a constructive trust and may be reviewed on remand on the basis of the evidence adduced on that issue.

■■ Frost and Dreisen, also, have raised the issue of estoppel as against the estate. "It is essential", to quote the language of this Court in Souter v. State Mutual Life Assurance Company (4th Cir. 1960) 273 F.2d 921, 926, "that one invoking an estoppel shall have justifiably relied, to his detriment, on the conduct of the party sought to be estopped—that is, that he changed his position for the worse." [11] The only possible act of Morrison on which Frost could rely for an estoppel would be that, by conveying title to Capital, he put it in Capital's power to sell the property and take purchase-money notes in payment with its name as payee, thereby indicating that Capital or its successor corporate "shell" was both the nominal and the real owner of the notes.[12] To predi-

11. To the same effect, *see*, United States v. Fidelity and Casualty Co. of New York (4th Cir. 1968) 402 F.2d 893, 898; United States v. Glassman Construction Company (4th Cir. 1968) 397 F.2d 8, 11; Davenport v. Ralph N. Peters & Co. (4th Cir. 1967) 386 F.2d 199, 207; General Cigar Co. v. Lancaster Leaf Tobacco Co. (D.C.Md.1971) 323 F. Supp. 931, 939.

12. This follows from the finding of the District Court:
"But even if it has established that fact, (i. e., that Capital gave no consideration for the transfer to it) it was his (i. e., Morrison's) improper conduct which permitted Frost and Dreisen to purchase the mortgage in question free of notice of any claim of Morrison."

cate an estoppel on any such circumstances in favor of one not a holder in due course would be to thwart the basic purpose of the Commercial Code and to nullify its specific provisions. As we have already pointed out, when Frost took the notes with knowledge that they were past due and in default, he took "nothing but the actual right and title" of his assignor and he took "subject" to any claim "based on * * * breach of trust or duty or any other reason" including a "constructive trust or other equity against the instrument or its proceeds" in favor of "any person" which, of course, would include Morrison. Frost was an experienced lawyer, practicing in the City of Washington. Whether lawyer or not, he is charged with knowledge of the law as it fixed his rights under his assignment. Since the law specifically denied him any right to assume, when he took his assignment that there were no "equities or other claims of rights against the instrument or its proceeds," there was no representation by Morrison's conduct on which Frost had any "justifiable" right to rely that Benn and his corporate "shells" held title to the notes free from any equities in favor of either Morrison or any other party.[13]

Even if this controversy were not controlled by the clear provisions of the

Uniform Commercial Code, we are not certain that the decree below could be sustained. Frost's standing as a *bona fide* purchaser for value without notice is open to serious question. His relationship with Benn was not casual. It was conceded that Benn frequented Frost's office, received mail there, and apparently gave Frost's office as the address for at least one of his "shell" corporations. Indeed, the very notes involved in this litigation had Frost's offices listed as the address of the payee Capital. Frost testified that this holding out of his offices by Benn was not with his approval and he said, when he heard of it, he ordered Benn to discontinue. But Benn was doing more than merely frequenting at odd times Frost's office; he had business dealings with Frost. Frost acted as attorney on behalf of several corporations connected in some way with Benn, with his fee guaranteed by Benn individually. He explained, however, that, while Benn was to pay his fee, Benn was not his client; in fact, he went further and stated that conflicts of interest would have prevented him from representing Benn in the litigation. Yet, conflict of interest or not, his fee was paid by Benn in the form of a credit of $50,000 against the purchase price of the very notes in litigation. Normally, he who pays one's fee

The "improper conduct" to which the District Court adverted was that Morrison "took no action to put prospective purchasers on notice of any latent claim until he filed the suit in Florida in September, 1966, long after the assignment of the mortgage by Capital, Southgate and others."
It is to be noted that the District Court consistently refers to "the assignment of the mortgage" rather than to the transfer of the negotiable instruments, overlooking the well-settled rule that the mortgage follows the obligation it secures and derives its negotiability from that of the obligation secured. 55 Am.Juris.2d, Section 1308, at 1052. That the mortgage follows the note it secures and derives negotiability, if any, from the note is the rule in Florida where the land under mortgage in this case was located, *see* Daniels v. Katz (Fla.App.1970)

237 So.2d 58, 60; Meyerson v. Boyce (Fla. App.1957) 97 So.2d 488, 489.

13. There is reference, both in the opinion and in the argument, to the efforts of Morrison to conceal his property from his wife. Whether he transferred his property to Benn under what the law will regard as a trust because of some scheme to deceive his wife may aid the wife in her assertion of interest in the property so transferred but it cannot avail Frost and Dreisen. Benn's ownership of the property would be equally under a constructive trust, whatever may have been Morrison's reason for creating such a trust, and any transfer of the notes by Benn, if made after maturity and default, would be equally subject to the constructive trust.

is his client. Moreover, Frost concedes that Benn's operations were "unethical," though he testified that he did not discover this until a few weeks after he had purchased the notes. And, for some largely unaccountable reason, Frost would not take an assignment of the notes in his own name because he did not wish his name associated with the notes. And he purchased the notes at a considerable discount, a fact which, of itself, would not impugn the good faith of the assignment, but is a fact that can properly be considered in connection with all the other facts in the case, including the unique form in which payment was made by Frost to Benn.[14] It must be borne in mind that the notes, in default as they were, carried "suspicion" on their face. It is of interest that the assignment to Frost's nominee came after the District Court had begun its consideration of the ownership of the Florida property and after Morrison had given notice, by his motion for leave to file a counterclaim, of his claim to the property or its proceeds. We are by no means as certain as apparently the District Court was that Frost could, even under the normal rules applicable to non-negotiable instruments, have qualified as a bona fide purchaser for value without notice. This is, of course, aside from the real issues in the case, which turn on the proper application of the Uniform Commercial Code for resolution.

Reversed and remanded with directions.

14. *See*, City of New Port Richey v. Fidelity & Deposit Co. (5th Cir. 1939) 105 F.2d 348, 353, 123 A.L.R. 1352.

Frost claims he gave Benn five cashier's checks payable to Southgate Associates (one of Benn's corporate *alter egos*) for $18,000 each, his personal check for $5,000, payable to Southgate Associates, and $5,000 in cash. The balance of the purchase price of the notes in question, secured as they were by property worth, by Frost's own appraisal, $200,000, was in the form of a $50,000 credit on an attorney's fee due Frost by Benn. All in all, it must not be forgotten, though, that for a long time after this transaction, Benn and/or his corporate *alter ego* was representing the notes as "under pledge" and, as late as 1971 the District Court was still uncertain whether the notes were "under pledge," as its opinion of May, 1971 demonstrates.