CAPITAL INVESTORS CO., Plaintiff,

Norman B. Frost, Deceased, and Harry Dreisen, Appellees,

v.

EXECUTORS OF the ESTATE OF Arthur R. MORRISON, Appellant.

No. 75–1498.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1977.

Decided Sept. 29, 1978.

Widener, Circuit Judge, dissented and filed opinion.

Joseph B. Hyman, Arlington, Va. (Echols & Hyman, Arlington, Va., on brief), for appellant.

Lee T. Ellis, Jr., Washington, D. C. (John A. Beck, Washington, D. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER and WIDENER, Circuit Judges.

PER CURIAM:

This is the fifth appeal in this diversity jurisdiction case.[1] Arthur R. Morrison, who was engaged in financial controversy with his estranged wife, was the owner of valua-ble lands in Rosslyn, Virginia and in Brevard County, Florida. He contracted to convey those lands to Capital Investors Company, a shell corporation wholly owned by James T. Benn, for $1,100,000 represented by unsecured notes. Because of Mrs. Morrison's claims against the Virginia lands, the contract was renegotiated and a new agreement entered into affecting the Virginia lands alone. Notes were issued to Morrison and Mrs. Morrison in the amount of $500,000 each, while $100,000 was retained by Capital Investors to "clear the title" which was encumbered by a relatively small deed of trust and which was complicated by what purported to be a prior conveyance of the fee and by another instrument which purported to be a ninety-nine year lease.

In the course of clearing the title to the Virginia lands, the district judge required Benn to give the Morrisons deeds of trust to secure their notes. There was default in the payment of the notes, and the Morrisons repurchased the Virginia lands at a foreclosure sale.

At the time of the first contract between Morrison and Capital Investors, a deed was signed by Morrison conveying the Florida lands to Capital Investors, in return for which he received Capital Investors unsecured notes in the amount of $400,000.[2] Benn persuaded Morrison that he could not lawfully encumber the Florida lands to secure the payment of the notes of Capital Investors because the title was uncleared.[3]

Initially, the district court held there was no evidence of fraud on Benn's part. At the time, it was concerned solely with the Virginia lands and at the time there was no evidence of a number of transactions affecting the validity and the value of the notes of Capital Investors. Later, after a full trial before another district judge, it

---

1. Our earlier opinions are reported at 484 F.2d 1157 (4 Cir. 1973); 453 F.2d 1365 (4 Cir. 1972); 387 F.2d 591 (4 Cir. 1967); 360 F.2d 462 (4 Cir. 1966).

2. Benn did put the certificate representing the capital stock of Capital Investors in escrow, but Morrison soon released it.

3. There was a recorded deed from Morrison to another who was later held to have been a naked trustee.

was found that no consideration had been paid for the conveyance of the Florida lands and that Capital Investors did not intend to comply with its obligations by paying the notes. He imposed a constructive or resulting trust upon the Florida lands, or the notes representing their proceeds. On appeal we affirmed that decision.

Shortly after issuing its notes aggregating $400,000 for the Florida property, Capital Investors sold the land to Do-Mor, Inc. for $460,000 of which $400,000 was represented by notes secured by a mortgage. Later, Capital Investors transferred the Do-Mor notes to another corporation owned by Benn and later to still another. One note in the face amount of $25,000 was paid by Do-Mor; another in the face amount of $50,000 was sold to Mrs. Morrison. The remaining two, aggregating $325,000, after default, were sold for $150,000 to a nominee of Norman B. Frost, who, in turn, sold a one-half interest in the notes to Harry Dreisen for $75,000.

After our affirmance of the judgment establishing a constructive or resulting trust, Frost and Dreisen intervened. The district judge then undertook to balance the equities between Morrison, on the one hand, and Frost and Dreisen, on the other hand, and, considering Frost and Dreisen untainted by Benn's machinations, he concluded that they should prevail. We reversed. We held that the Uniform Commercial Code controlled, and that, since the Do-Mor notes were in default at the time of their purchase by Frost, they took the notes subject to lawful claims against them. However, we rejected Morrison's contention that Frost and Dreisen were bound by the earlier decision imposing a constructive or resulting trust upon the notes. They had not been parties to the litigation when that issue was heard and decided. We thought they should have an opportunity to relitigate the issue if they could produce additional relevant evidence.

On remand, Frost and Dreisen produced no new evidence, but did prevail upon the district judge to review his earlier decision imposing a trust upon the notes. At this time he found no fraud on Benn's part. Alternatively, he found that Morrison's claim to the Florida lands was foreclosed by a release purportedly signed by Morrison. He found that the release was supported by a consideration and effectively barred the claim.

I.

■ While we held that the strict rules of *res judicata* did not foreclose relitigation of the issue by Frost and Dreisen, who had not been parties to the litigation when the issue was decided, we did not intend for earlier findings and conclusions, which had been affirmed on appeal, to be overturned with no new evidentiary basis for it.[4] There was no infirmity in the earlier findings and conclusions. After their affirmance on appeal, the principles of the law of the case required adherence to them.

■ The principle is not absolute nor inflexible. In such cases courts have an inherent power to correct earlier error, if it becomes apparent, and to avoid injustice, but there is no such situation here. The evidence of Benn's fraud is compelling.

Benn persuaded Morrison to accept the unsecured notes of Capital Investors. There was no cash payment. He was careful not to obligate himself. He quickly had Capital Investors deed the land to Do-Mor, and then he stripped Capital Investors of its only assets, leaving it with no resources with which to pay anything on the notes given to Morrison. Do-Mor paid one note in the face amount of $25,000, but it is not clear that any of that got to Morrison. The $50,000 note which had been sold to Mrs. Morrison was subsequently paid by Frost and Dreisen. No payment was ever made on the remaining notes aggregating $325,-000. The mortgage securing the payment of those Do-Mor notes has now been fore-

4. *See Virginia Electric & Power Company v. NLRB,* 132 F.2d 390 (4th Cir. 1942), aff'd 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); *Stonega Coke Sign & Coal Co. v. Price,* 116 F.2d 618 (4th Cir. 1940).

closed by Frost and Dreisen, however, and they acquired title to the land in the foreclosure sale. What Benn did amply supports the finding that he never intended that the Capital Investors notes be paid; he diverted all of Capital Investors' assets and stripped it of all means of payment. In the process, what cash flowed to Capital Investors or to Benn, or to other controlled corporations probably was not passed on to Morrison. All of it certainly was not.

Benn was an accomplished fraud artist. On a plea of guilty, he was convicted in 1971 in the United States District Court of the District of Columbia of fraud by mail. In 1963, the Tax Court found him guilty of tax fraud. T.C. Memo 1963–151. In its opinion, the Tax Court referred to a pattern of acquiring valuable properties largely on the basis of notes which were, or became, worthless and which Benn never intended paying. The kind of complicated schemes in which he engaged are illustrated in the opinion of Judge Jones in *Sankin v. 5410 Connecticut Avenue Corporation,* D.C.D.C., 281 F.Supp. 524 (1968), in the opinion of Judge Fulton in *Walsh v. Continental Insurance Underwriters, Inc.,* (S.D. of Fla No. 63–576–Civ–CF, 1965) and in the opinion of Judge Hoffman in *Freehill v. Benn* (E.D. of Va., No. 3421, 1969). He had the capacity of persuading even sophisticated business people to place their trust in him. Though he was not a lawyer, he dealt in legalisms. He convinced Morrison that he was a "legal genius" and a helping friend. What he did to Morrison, however, was in the pattern disclosed in the court cases. When he stripped Capital Investors of its assets and devoted them to his own use without paying the Morrisons, he clearly established that his intention, from the beginning, was not to pay the Morrisons.

Frost, about whom the district judge was concerned, was not entirely an innocent, unsuspecting victim of deception. Several reasons for this are catalogued in the opinion reported at 484 F.2d 1157 at pages 1164 and 1165. Frost, now deceased, was a reputable lawyer in the District of Columbia,

but he knew Benn. His firm represented some of Benn's associates in the *Sankin* case. Indeed, he paid Benn only $100,000 for the two notes, the remaining $50,000 of the price being a credit for legal fees due Frost's firm by Benn's associates, the payment of which Benn had guaranteed. From the facts in the *Sankin* case, Frost was bound to have known the kind of man Benn was.

Under the circumstances, we think the district judge was required to adhere to his earlier findings and conclusions that a constructive or resulting trust did arise.

## II.

Within three months of the initial transaction, Morrison purportedly signed a release acquitting Capital Investors and Benn of all claims by him. Released were any claims to the Florida lands and to any payments by Do-Mor on its notes. The release was under seal and delivered in Virginia. The district court held that Morrison's estate had failed to prove there was no consideration for the release, and he concluded that it was valid and binding.

Benn never testified that he gave any actual consideration for the release. He claimed generally that he had given or paid Morrison some $28,500, though Morrison testified it was no more than $4,000. The contract obligated Benn to pay to Morrison a minimum of $25,000 a year, for living expenses, until the titles were cleared. Benn produced receipts purportedly signed by Morrison for cash payments in 1963 of $30,537, but, of that, $12,500 was payment for some corporate stock, according to Benn's testimony.. Thus, only $17,500 was paid to Morrison by Benn in 1963 for the real estate, and that would have been upon his obligation to make advances for Morrison's expenses each year up to $25,000. The release was dated August 6, 1963, and the nearest date to that date of any of the receipts is July 15, 1963, when Morrison acknowledged the receipt of $2,037.[5] There

---

5. Morrison, of course, denied that he received more than approximately $4,000. He specifi-

cally denied receipt of the $10,000 payment for which Benn produced a receipt.

was no receipt for any payment by Benn in 1963 after July 15. Even if it be assumed that some portion of whatever monies Benn funneled to Morrison was purported consideration for the release, the consideration was grossly inadequate, for the Morrisons held notes aggregating $1,000,000, and the lands were thought by Morrison to be worth that.

Defensively, it is suggested that under Virginia law the seal on the release conclusively imports consideration, at least when the litigation is between the original parties.[6] There are exceptions, however, when different parties are involved, and possibly when proceedings are in equity, as these are.[7] Surely, however, there is an exception in equity when an application of the strict rule of the common law would perpetrate a fraud or grave injustice.

In *Cooper v. Gregory,* 191 Va. 24, 60 S.E.2d 50, the holders of contingent remainders under the will of their father purported to convey a portion of the land in fee to their sister in exchange for a promise to care for another, mentally incompetent, sister as long as the incompetent lived. The agreement was under seal. Apparently the sister, as long as she lived, did take care of the incompetent, but after her death the representatives of her estate declined to do so longer. The purported grantors of the land sought to enforce performance by the sister's estate of the agreement she had made. The Supreme Court of Virginia held the agreement unenforceable despite the seal. First, it was said that the purported grantors of the land had only contingent remainders in it so long as their mother lived, and they were without power to make a valid conveyance. Moreover, it was said, if anything was conveyed, its value was so

slight in comparison with the financial burden assumed by the sister that it would be unconscionable to enforce the bargain. The Supreme Court of Virginia concluded:

"Equity will not lend its aid to the performance of such an unconscionable bargain—certainly not in a case of this nature where the other contracting parties surrendered no rights and suffered no detriment."

Here there was no proof that any consideration was paid for the release.[8] The dates and the amounts of the payments Benn claimed to have made are known, and none of them can be related to the release. If any at all was paid, it was a pittance in contrast to the claim released. The release purports to be a release of all claims, though there is specific reference to the Florida lands and the Do-Mor notes. If construed to apply to the Florida lands alone, the claim purportedly released was still for more than $400,000. The gross disparity between the amount of the claim and any possible consideration for the release makes enforcement of the bargain outrageously unconscionable.

Benn was an experienced con artist, once convicted of tax fraud. We do not know how he did it, but for a while at least, he seemingly could persuade Morrison to do anything Benn wished. He persuaded him to sell him the Virginia and Florida lands for unsecured notes (he gave the Morrisons a deed of trust on the Virginia lands only because Judge Butzner, after the first trial, required him to do it). He persuaded Morrison that there was some legal inhibition in Florida which prevented his securing payment of the notes arising out of the transfer of title to the Florida lands. Benn had placed the certificate representing the stock

6. *Norris v. Barbour,* 188 Va. 723, 51 S.E.2d 334 (1949); *Turner v. Hall,* 128 Va. 247, 104 S.E. 861 (1920).

7. *See Branch v. Richmond Cold Storage Inc.,* 146 Va. 680, 132 S.E. 848, 851 (1926), in which it is flatly stated that the common law rule that a seal imports consideration is not the rule in equity.

8. The presence of the seal would place the burden upon Morrison to go forward with evidence to show the absence of consideration for the release, but there is no absence of evidence. Morrison testified that he never got more than $4,000 from Benn, and the receipts show exactly what Benn claimed to have paid Morrison and when.

of Capital Investors Company in escrow, supposedly to give Morrison some little security, though it was precious little, but he soon persuaded Morrison to agree to a release of that escrow agreement. If Morrison signed this purported release so soon after the initial agreement with Benn, it is but one more testimonial of Benn's persuasive power over him. But it was the same kind of persuasive power exercised by Benn over other victims, as the reported cases show.

█ Since there was no actual consideration for the release, or, if any, so little as to make enforcement of the release unconscionable, we find under *Cooper v. Gregory* that under Virginia law the seal should be disregarded and the release declared invalid.

Since Frost and Dreisen have converted their ownership of the Do-Mor notes into ownership of the land, the Morrisons now have a constructive or resulting trust in the Florida land and are entitled to an order requiring the defendants to convey it to them. However, the defendants will be entitled to some credits. They paid the $50,000 Do-Mor note which had been purchased by Mrs. Morrison. Supposedly they have paid taxes, and there may be other items of expenses which equitably may be chargeable to the Morrisons upon a reconveyance of the land. On the other hand, they should be accountable for any income. This will necessitate some accounting and further proceedings in the district court.

*REVERSED AND REMANDED.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent because the opinion of the panel confessedly does not give any weight to the current fact finding of the district court; I think it does not other than formally follow *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877); and I think it departs from established Virginia precedent which controls us here. My disagreement with the panel on its factual treatment of the case is somewhat intertwined with its

treatment of *Pennoyer v. Neff,* as will be apparent. My disagreement with it on its failing to follow Virginia precedent is self-evident from this dissent.

I

With respect to *Pennoyer v. Neff,* a previous panel, as the majority mentions, had sent this case back for another trial so far as Frost and Dreisen were concerned, because they were not parties to the adverse decision against them. Nevertheless, despite different attorneys asserting different interests from a different point of view, this court now disposes of the case on "earlier findings and conclusions, which had been affirmed on appeal." While there may not have been any new evidence taken, the evidence presented to the district judge was different, and that is not denied. It not only included different matter, but was presented from the view of Frost and Dreisen, not parties to the case at the time of the adverse findings which they now find to be binding.[1] The very reason for the rule of *Pennoyer v. Neff,* that a man shall not suffer a judgment against him unless he is properly a party to the cause, is violated by the majority here, for the attorneys for some other party had no interest in protecting the rights of Frost and Dreisen. Rather, should it have served the purposes of their clients, they were ethically obligated to make absent parties appear in as bad a light as possible.

I think the rule the court today announces of requiring a new evidentiary basis for a new party, rather than a reconsideration of the evidence in the light of the fact that there are new parties, does not withstand either logical or constitutional analysis. Reconsideration of the evidence in the light of the fact that there were new parties is exactly what the district judge did, and I think his findings of fact are entitled to the same consideration as if they had been parties in the first place. Merely stating, as the panel does, that the first decision of the court finding a resulting trust should be affirmed because there is no

---

1. No point is made of the absence of Frost and Dreisen from earlier proceedings.

new evidentiary basis, meaning no additional evidence, as I have said, I think is a misapplication of the rule of *Pennoyer v. Neff* which should require at the very least a reconsideration of all the evidence as was, I think, correctly done by the district judge. The panel decision, erroneously I think, shifts the burden from Morrison's estate, to prove its case as the proponent, to the defendants Frost and Dreisen to prove incorrect previous fact findings in a case to which they were not parties. That the panel decision clearly does just this is shown by its finding, not that the district judge was clearly erroneous, but that "he was required to adhere to his earlier findings and conclusions." P. 655.

Along this line, another thing needs mention. The panel relies on "law of the case" to require "adherence to" the fact finding previous to the time Frost and Dreisen were parties to the case. P. 654. I do not agree for I do not think previous fact finding can bind a person who is not a party to the case to his detriment in the context presented here absent at the very least a complete reconsideration of the record as a whole plus the opportunity to present evidence after the absent defendant is made a party to the case.

Finally, the majority cites *Virginia Electric & Power Co. v. NLRB,* 132 F.2d 390 (4th Cir. 1942), aff'd 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943), and *Stonega Coke Sign & Coal Co. v. Price,* 116 F.2d 618 (4th Cir. 1940), for the proposition that the district court was bound by its earlier findings. I think neither of these cases supports such a rule. In both *Virginia Electric* and *Stonega Coke* the same parties were before the court both before and after the remand. Neither case, I suggest, has anything to do with the binding application of prior findings of fact to persons who were not parties to the action at the time the fact findings were made. The affirmance of the *Virginia Electric & Power* case, I note, did not discuss the point under consideration.

## II

For the fifth time in the thirteen year history of this diversity case, we consider issues relating to a 1963 land conveyance between Arthur R. Morrison and Capital Investors Company (Capital). Here, we are most directly concerned with the ownership of two notes, in the total amount of $325,-000, as the balance of the proceeds for the conveyance of land in Brevard County, Florida, from Capital to Do-Mor, Inc. Capital initially purchased the land from Morrison, whose estate claims the notes as the beneficiary of a constructive trust.

The issues before us are whether the district court was clearly erroneous in finding that: (1) valid consideration supported the sale of the Florida land from Morrison to Capital, (2) Capital, through its sole owner, James T. Benn, was not guilty of fraud in the purchase of the property from Morrison,[2] and (3) a release executed by Morrison with respect to all claims arising out of the sale of the Florida property was supported by valid consideration.

On May 18, 1963, Morrison entered into a contract with Capital for the sale of lands located in Arlington County, Virginia, and Brevard County, Florida, for the stated consideration for the conveyance of $1,100,000, which was to be paid by a "judgment note." Complications ensued, however, that threatened to prevent Morrison from conveying good title to the Virginia property. Pursuant to an earlier marital property settlement, Mrs. Morrison, who was not a party to the May agreement, held notes in the amount of $180,000 secured by a deed of trust on that property. In July 1963, the notes were in default, and Mrs. Morrison purported to take action to have title to the property vest in her.

Because of this difficulty with Mrs. Morrison, Morrision was forced to enter into a subsequent agreement concerning the land with Capital, this time with Mrs. Morrison as a signatory. This agreement was dated

---

2. Arthur Morrison died on January 24, 1970. He and Mrs. Morrison were divorced November 29, 1962.

July 29, 1963. The total stated consideration was the same as in the previous contract, to be equally divided between the Morrisons (with $100,000 to be used to clear the title), but the agreement appeared to refer only to the Virginia property.

By order of the district court dated June 29, 1965, fee simple title to the Virginia property was quieted in Capital. This appeal directly concerns the Florida property alone.[3] That land was conveyed to Capital by deed dated May 18, 1963, pursuant to the original May 18, 1963 contract. On June 21, 1963, Capital conveyed the Florida realty to Do-Mor, Inc., which, in addition to releasing trusts of $60,000, issued four purchase money notes in the total amount of $400,000, secured by a purchase money mortgage.[4] That mortgage and two of the Do-Mor notes were subsequently purchased by Norman B. Frost and Harry Dreisen in 1965.

The estate of Morrison claims that Capital held the Do-Mor notes as a constructive trustee for Morrison's benefit in 1963 on account of Capital's fraud or unjust enrichment in the initial conveyance of the Florida land to Capital.[5] If the estate were able to establish successfully that Morrison was entitled to such a constructive trust, the claim is that it would prevail over the interest of Frost and Dreisen in the notes or the Florida land itself.[6] This, they say, is because we held the last time this case was before us that Frost and Dreisen were not holders in due course of the Do-Mor notes under § 3–306 of the Uniform Commercial Code, and hence took the notes from Capital subject to all valid claims on the notes against Capital. 484 F.2d 1157 (4th Cir. 1973). In the last appeal, we remanded to the district court to determine whether, as between Morrison on the one hand and Frost and Dreisen on the other, Morrison was entitled to a constructive trust in the two notes in question.[7]

On remand the district court held that the estate failed to meet its burden of proof on the issue of a constructive trust. Specifically, it found that the 1.1 million dollar purchase price was consideration for both the Virginia and Florida properties, not for the Virginia property alone. The district court also held that it was necessary to

---

**3.** This litigation was initially instituted in 1963 by Capital to quiet title to the Virginia property. The issues we decide today arise by way of counterclaim filed by Morrison in 1965.

**4.** Note No. 1, for $25,000, was paid by Do-Mor; Note No. 2, for $50,000, was sold to Mrs. Morrison and was subsequently paid by Frost and Dreisen. This appeal concerns the ownership of notes 3 and 4, for $100,000 and $225,000 respectively.

**5.** The record is clear that default occurred on the notes issued by Capital as payment for the Virginia and Florida properties. Capital claims to have paid as much as $28,500; Morrison denies receiving more than about $4,000—both figures far from the purchase price in excess of one million dollars. This default forms one of the bases of Morrison's executors' claim of entitlement to a constructive trust on the ground of Capital's unjust enrichment. They also claim that the Florida land was conveyed without consideration because they say the agreement of July 29, 1963 applied only to the Virginia property and superseded the earlier agreement that undeniably pertained to both the Florida and Virginia lands.

It is quite noteworthy that the Morrisons foreclosed on a later obtained deed of trust they held on the Virginia property in 1970,

which was sold for $700,000 to themselves. Morrison's executors obtained a deficiency judgment for about $400,000 against Capital in 1971.

**6.** Following Do-Mor's default on notes 3 and 4, Frost and Dreisen foreclosed on the Florida property, and purchased it at the foreclosure sale. The notes having been satisfied in part, at least, from the proceeds of the sale, Morrison's executors apparently now claim either the property itself as standing in place of the notes, or the benefit of any deficiency still owing by Do-Mor.

**7.** Our most recent decision in this case reversed the district court's 1972 judgment that denied a constructive trust on the basis of equitable principles of real estate law, favoring Frost and Dreisen as good faith purchasers without notice. We held that the case was controlled by the Uniform Commercial Code provisions dealing with the purchase of negotiable instruments.

We also held that the district court's 1971 opinion, in which Morrison's executors prevailed in their constructive trust claim, was not controlling since Frost and Dreisen were not parties to the litigation at that time.

prove fraud before a constructive trust should be imposed and that the estate failed to meet its burden of proving fraud on the part of Benn, the owner of Capital. While Morrison concededly never received full payment on the notes issued by Capital for the purchase price, to the extent those notes were unsecured Morrison was merely a general creditor of Capital with claim for payment of the notes which has been prosecuted to a conclusion.

## III

The estate claims that the district court committed error in requiring proof of fraud to establish a constructive trust. It asserts that the constructive trust remedy can be administered with considerably more flexibility, specifically where unjust enrichment is demonstrated. The district court stated that "[t]he basis of a constructive trust is fraud, actual or constructive," citing cases, and imposed upon the appellant the burden of proving fraud by "clear and convincing evidence." *Sutton v. Sutton,* 194 Va. 179, 72 S.E.2d 275 (1952); *Malbon v. Davis,* 185 Va. 748, 40 S.E.2d 183 (1946).

There are statements in the Virginia cases, relied upon by the district court, suggesting that either fraud or breach of a fiduciary duty is requisite to the imposition of a constructive trust. *Miller v. International Union of Brewery Workers,* 187 Va. 889, 48 S.E.2d 252 (1948); *Porter v. Shaffer,* 147 Va. 921, 133 S.E. 614 (1926). While there is persuasive authority that unjust enrichment may constitute a ground for the creation of a constructive trust,[8] I would find it unnecessary to express an opinion on the matter, for I would hold that the dis-

trict court was not clearly erroneous in finding that the sale of the Florida land was supported by valuable consideration. This compels the conclusion that, absent fraud, there was no unjust enrichment in this case as a matter of law sufficient to justify a constructive trust. There was at most a basis for a suit for damages, and this claim, if it ever existed, is co-extensive with the $400,000 judgment already obtained in 1971 against Capital by Morrison's estate and the Morrisons' foreclosure upon the purchase money notes.

The contract of May 18, 1963, pursuant to which Morrison agreed to convey the Florida property, recites a consideration for the conveyance of 1.1 million dollars, in the form of a judgment note payable within five years and bearing six percent interest.[9] As a matter of basic contract law, mutual promises constitute a valuable consideration in a bilateral contract. *Adams, Payne & Gleaves v. Indiana Wood Preserving Co.,* 155 Va. 18, 154 S.E. 558 (1930); *Bernstein v. Bord,* 146 Va. 670, 132 S.E. 698, 699–700 (1926). That the notes executed and delivered by Capital for the payment of the purchase price to Morrison constituted a consideration for the conveyance and a legally binding obligation needs no further elaboration than reference to the Morrisons' foreclosure on those notes and the obtaining of a deficiency judgment by Morrison's estate.

Morrison's estate's argument that the July 29, 1963 contract superseded the earlier agreement and left the Florida conveyance unsupported by consideration is without merit. The district court, with all interested parties before it,[10] unequivocally

---

8. See *Buchanan v. Brentwood Fed. Savings & Loan Ass'n,* 457 Pa. 135, 320 A.2d 117, 126–7 (1974); *Annon v. Lucas,* 155 W.Va. 368, 185 S.E.2d 343, 352 (1971); D. Dobbs, *Handbook on the Law of Remedies,* § 4.3, at 246 (1973); 4 Scott, *The Law of Trusts* § 462 at 3103 (2d ed. 1956); 31 *Va.L.Rev.* 962 (1945).

9. Morrison also took all of the capital stock of Capital in escrow as collateral to secure the payment of the purchase price.

10. The district court's 1971 holding that the appellants were entitled to a constructive trust was based on its finding, with opposing parties not before it, that the Florida conveyance was not supported by consideration. The finding was reconsidered by that court when both sides were in court and represented.

found that the purchase price of the Virginia and Florida properties together was 1.1 million dollars, and that the July agreement reaffirmed the earlier agreement and conveyance. This finding, in the words of the district court, "is established beyond doubt." The district court's interpretation of the July transaction, that it was intended solely to secure Mrs. Morrison's necessary cooperation in fulfilling the obligations of the May contract, and not to displace that agreement, is amply supported by the record.

In order for Morrison's estate to rely upon the breach of an arms-length contract as the basis for a constructive trust, it is necessary to prove that the breaching party never intended to perform his contractual obligations—a circumstance which may constitute fraud. It had the burden of proving fraud by clear and convincing evidence. *Malbon v. Davis,* 185 Va. 748, 40 S.E.2d 183, 187 (1946). The district court found that "not a particle" of evidence had been presented by appellants to prove fraud since 1964, when Judge Butzner, sitting as a district judge in this case, came to the conclusion that neither the May 1963 nor the July 1963 contracts and conveyances were procured by actionable fraud.[11] Thus, two district judges, after full hearings in the protracted history of this litigation, have rejected the contention that Capital committed fraud in it transactions with Morrison.

I have examined the statements in the panel opinion intended to establish Benn's fraud (meaning Capital), and note that they consist largely of a list of unsavory activities from Benn's life over the past fifteen years. It should not be our province to pass judgment on Benn's life,[12] only to review whether the district court's conclusion was clearly erroneous with respect to a particular sale of land in 1963. I conclude that it was not. Benn and Morrison testified orally before Judge Butzner, who found no fraud. Judge Kellam found no evidence of it after Judge Butzner's finding. I do not think the findings are clearly erroneous. FRCP 52(a).

What is left of the case, then, in my view, is a situation in which notes taken in consideration for the sale of land were not paid. The transaction was untainted by fraud and supported by a valuable consideration. Nothing prevented Morrison from taking a purchase money deed of trust on the real estate as security for payment of the purchase price as he agreed to take the Capital stock as security. There is simply no theory under which a mere failure to pay a debt can justify the imposition of a constructive trust. *McKee v. Paradise,* 299 U.S. 119, 57 S.Ct. 124, 81 L.Ed. 75 (1936); *Cherno v. Dutch American Mercantile Corp.,* 353 F.2d 147, 154 (2d Cir. 1965); see *Porter v. Shaffer,* 147 Va. 921, 133 S.E. 614 (1926). Were a contrary rule to prevail, its effect would often be to create an unwarranted preference in favor of one general creditor over others. *McKee,* 299 U.S. p. 123, 57 S.Ct. 124.

IV

As an alternate ground for its holding, the district court relied upon a release exe-

11. While Judge Butzner's finding of no fraud on the part of Capital, affirmed by this court in 360 F.2d 462 (4th Cir. 1966), may be res judicata on that issue against those who were parties to that proceeding, or may work an estoppel in other situations, I would not find it necessary to rely on that principle nor similarly upon the result of a suit in Florida to which Morrison was a party which apparently held, after the conveyance to Capital, that he had no further interest in the Florida land. But a reliance on the finding by Judge Butzner that Capital was free of fraud in 1963 in a case in which Capital *was* a party is much more logical to me than the present finding that Frost and Dreisen are bound by a finding that Benn was guilty of fraud, or like activity, in a case in which they were *not* parties.

12. None of the activities of Benn listed on p. 655 of the opinion, for example, are even remotely connected to the transactions at issue here. The panel relies on them for its fact finding. I think it is in error with perhaps the sole exception of a criminal conviction of tax fraud as going to credibility, and even that is not spelled out.

cuted by Morrison on August 6, 1963, releasing Capital and Benn from all claims arising out of the sale of the Florida property. Appellants seek to avoid the effect of this release by arguing that it was unsupported by consideration, notwithstanding that it acknowledges receipt of valuable consideration and was executed under seal.

Under Virginia law, a sealed instrument generally conclusively imports consideration so far as the parties [13] to the agreement are concerned. *Norris v. Barbour,* 188 Va. 723, 51 S.E.2d 334 (1949); *Turner v. Hall,* 128 Va. 247, 104 S.E. 861 (1920); see *Northwestern Nat'l Ins. Co. v. Cohen,* 138 Va. 177, 121 S.E. 507, 508 (1924); *Ferries Co. v. Brown,* 121 Va. 13, 92 S.E. 813 (1917). While this rule does not necessarily obtain when the instrument is attacked for fraud, and it is true that equity will look to the substance rather than the form of a transaction to prevent a fraud, see *Cooper v. Gregory,* 191 Va. 24, 60 S.E.2d 50 (1950), Morrison's executors, with the burden of producing evidence upon them, failed to show that Capital obtained the release in a fraudulent manner, or indeed that the release was in any way irregular. The district court's conclusion that the release was supported by valuable consideration is in accord with applicable law, is based on facts supported by the record, and is not clearly erroneous. FRCP 52(a).

The case of *Woody v. Schaaf,* 106 Va. 799, 56 S.E. 807 (1907), is very nearly indistinguishable on its facts from the case at hand. There, an obligation under seal given for an antecedent debt was in issue after the death of the maker of the obligation. The court held that, as against the maker's estate, the seal was conclusive evidence of the debt, and, as against an insurance company involved which was defending on the ground its policy on the maker's life was a wager policy, the seal was *prima facie* evidence.

*Prima facie* evidence, in Virginia, shifts the burden of going forward with the evidence, *Witt v. Merricks,* 210 Va. 70, 168 S.E.2d 517 (1969). It is evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted. It imports that the evidence produces for the time being a certain result but that the result may be repelled. *Babbitt v. Miller,* 192 Va. 372, 64 S.E.2d 718 (1951).

Here, applying the rule of *Woody* rigidly, the release under seal would conclusively establish consideration against Morrison's estate. But, even assuming for argument that Morrison's estate had some kind of equity to place it in the position of those in *Norris* and *Cooper* who sought to avoid the effect of consideration imported by a seal, the instrument under seal nevertheless established *prima facie* evidence of consideration. The district court, I think correctly, held that Morrison's estate had failed to prove there was no consideration, which furnishes an additional reason for its conclusion. Its finding is supported by the record.

The majority here, in a case in which the person who has executed a release under seal has died, wrongfully places the burden of proof on those claiming the release is valid, rather than those claiming the release is invalid, a legal proposition I think exactly contrary to established Virginia precedent on the very point.

---

**13.** When a party has died, the rule may be relaxed. See e. g., *Norris* and *Cooper,* infra.